## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF MICHIGAN
## SOUTHERN DIVISION

TERRANCE EDWARD BAR,                    Case No. 21-cv-11444
        Plaintiff,

v.                                      Hon. Paul D. Borman

KALITTA CHARTERS II, LLC,
        Defendant

Collin H. Nyeholt (P74132)              Nicholas C. Bart (6257719 (IL))
LAW OFFICES OF                          FITZPATRICK, HUNT, PAGANO, AUBERT LLP
CASEY D. CONKLIN, PLC                    10 South LaSalle St., Suite 3400
Attorney for the Plaintiff              Chicago, IL 60603
4084 Okemos Road, Ste B                 (312) 728-4901
Okemos, MI 48864
(517) 522-2550                          George Kelsey (P15855)
collin@caseydconklin.com                KELSEY LAW GROUP, P.C.
                                        Willow Run Airport
                                        49710 Tyler Road Extension
                                        Belleville, MI 48111
                                        (734) 973-1222

## SECOND AMENDED COMPLAINT

## Jurisdiction and Venue

1. This is a claim for violation of Title VII of the Civil Rights Act of 1964 (Title VII), 42 USC § 2000e.

2. Plaintiff TERRANCE BAR is a permanent resident of White Lake, Michigan which is in Oakland County and within the jurisdictional bounds of the Eastern District of Michigan.

3. Defendant KALITTA CHARTERS II, LLC ("Defendant Kalitta," "Kalitta") is a business entity organized under the law of the State of Michigan that regularly does business in the State of Michigan. Kalitta maintains its primary business headquarters at the Willow Run Airport which in Ypsilanti Michigan, which is in Washtenaw County and within the jurisdictional bounds of the Eastern District of Michigan.

4. This claim stems from Defendants' actions towards Plaintiff during the course of his employment that occurred, in substantial part, in the State of Michigan.

5. The Court may exercise subject matter jurisdiction over the claims stemming from federal law pursuant to 28 USC § 1331. And, this Court is the proper venue for this Title VII claim pursuant to 42 USC § 2000e-5(f)(3) which provides that a private cause for violation thereof "may be brought in any judicial district in the State in which the unlawful employment practice in alleged to have been committed."

## ALLEGATIONS

6.    Plaintiff was employed by Defendant Kalitta as a pilot.

7.    Plaintiff was hired by the Defendant in or about March of 2018. His place of report was the Defendant's home base in the Willow Run Airport, which is approximately a 45 minute commute from his home.

8.    As a licensed pilot, Plaintiff was subject to ongoing training and certification from Defendant in order to maintain his employment.

9.    On or around December 2019 Defendant's Check Airman Greg DeBourge made disturbing and intimidating comments on social media.

10.   Because of his position as Check Airman with Defendant, Mr. DeBourge had the power and ability to washout (fail) Plaintiff from performing his job. During his training and evaluations, Mr. DeBourge basically held Plaintiff's career in his hands.

11.   On or around February 20, 2020, and before February 21, 2020, DeBourge did a disturbing and sexually suggestive simulation act (simulated fellatio) in a meeting at a hotel in Miami, Florida, while two female co-workers were present.

12.   On February 21, 2020 Check Airman DeBourge, during a mandatory training session, showed Plaintiff and his Simulator Partner Brandon Kearns a homosexual pornographic video on his cellular phone.

13.  Plaintiff believed that DeBourge's showing him pornographic material in the workplace constituted unlawful sexual harassment.

14.  Plaintiff was extremely disturbed by the sexual imagery and was unable to continue. He had to leave the simulator training session. He went outside the training facility, and called Darrell Coleman, the Director of Training. Mr. Coleman did not answer Plaintiff call and he left him a voice message to please return his call, but he never did. The only correspondence Plaintiff had with him was a text message he sent him on July 17, 2020.

15.  Plaintiff then called the home office and requested the Chief Pilot, Mike Geadtke's cell phone number, which they provided to him.

16.  By reason of his position as Defendant's Chief Pilot, Geadtke had authority and ability to fire, hire, promote, demote, or discipline Plaintiff and DeBourge. He also had the ability to direct Plaintiff and DeBourge in the manner in which they would carry out their work assignments.

17.  Plaintiff proceeded to call Mike Geadtke and explained to him what had just happened with the pornography and stated that he was disturbed and unable to continue with the training. Mr. Geadtke told Plaintiff he was presently "across the street" and would "be right there."

18.  Plaintiff went back inside the building and Geadtke arrived shortly thereafter. Plaintiff told him exactly what had happened in the simulator. Geadtke, it is

believed, was able to observe how visibly upset Plaintiff was. Geadtke gave Plaintiff his car keys and told him to go back to his hotel room, which he did.

19.   DeBourge, to the best of Plaintiff's knowledge and belief, was never disciplined for exposing him to the homosexual pornography.

20.   Immediately after Plaintiff's report of the incident with DeBourge, the Defendant's management initiated a campaign of harassment and intimidation towards him that culminated in his termination of employment.

21.   Shortly after the incident above, Plaintiff's place of reporting was changed from the Willow Run airport to Cincinnati Northern Kentucky International Airport, which is approximately a four hour drive from his home.

22.   On a typical day, Plaintiff and his coworkers would fly from Cincinnati to a different city, stay there all day in a hotel, then fly back to Cincinnati at night until they did it again the next morning. But, after reporting the incident with DeBourge, Plaintiff was assigned to a crew room where he would sleep in a reclining chair until their next flight in the morning. This was particularly concerning to Plaintiff, because it was during the height of the Covid-19 pandemic and he was exposed to different flight crews from different countries. Plaintiff learned that the Defendant continued to pay for hotel rooms for other Captains.

23. On more than one occasion, after reporting the DeBourge incident, Plaintiff was scheduled to fly out of Cincinnati where he showed up for duty and there was no aircraft or captain for him.

24. On another occasion, Plaintiff was scheduled to fly out of Phoenix, Arizona for the whole week. But, he only flew a couple of times and spent the rest of the week staying in the hotel.

25. On June 5, 2020 Plaintiff was paired to fly with Captain Buchanan on the flight out of Rochester Airport in New York. On the takeoff they experienced an aircraft malfunction which caused the aircraft to veer off the runway. The aircraft in question, in fact, aircraft possibly had the same issue when it was at British Airways according to comments made by a pilot who flew the aircraft and stated it in a pilot forum board. Captain Buchanan did not perform the standard operating procedures by aborting the take off, by not retarding throttles and disengaging the auto-throttles and not extending the speed brakes and employing the thrust reversers, which in all probability could have prevented the aircraft from exiting the runway.

26. Buchanan, upon information and belief, had a runway incursion in Los Angeles International Airport two months or so before June 5, 2020 where he entered a runway without permission and a plane was landing and had to go around.

27.  The Defendants knew, or reasonably should have known, that the runway excursion was caused by mechanical failures of the unsafe plane, the actions or failures to act of Buchanan, and *not* any fault of Plaintiff's.

28.  Plaintiff and Buchanan were both put through retraining. Buchanan failed his simulator check ride and was demoted to First Officer and was assigned to fly with a regular line pilot. Plaintiff, however, *passed* his check ride a few days later, but *he* was put through recurrent training with *three* different Check Airmen.

29.  The last of the three Check Airmen, Rob Numbers, made false statements on the Instructor comment form. The information he presented in the report is demonstrably inaccurate, and contrary to the actual records of the flight. In way of example, Numbers claimed that Plaintiff overshot the final runway nine in Cincinnati but this can be disproven by Flight Aware flight tracking data. Most of his comments, in fact, can be refuted by FlightAware flight tracking data, by eyewitness accounts including the ride along mechanic, and just plain common sense. Further, Plaintiff attempted to refute the inaccurate statements to the Chief Pilot but was not allowed to do so.

30.  The only reason Plaintiff was *in* the training was because Defendant's managers chose to blame him for an incident that was really caused by the other pilot's malfeasance and Defendant's unsafe plane.

31.  The manner in which Plaintiff was evaluated in the re-training was disparate to the other individual involved in the incident.

32.  In or about August of 2020, Plaintiff was called into Chief Pilot Mike Geadtke's office. Geadtke relied upon the false statements in Numbers' Instructor comment form. Plaintiff explained to him that the statements were false, but Geadtke did not care and terminated his employment.

33.  The *real* reason Geadtke terminated Plaintiff's employment was adverse consideration of his prior complaint against check airman DeBourge for exposing him to homosexual pornography.

34.  Because the Defendant put Plaintiff through additional training, Rob Numbers' false statements in the instructor form became part of his licensing record and will affect his employability in future. If the Defendant had merely *terminated* him after the runway incident, this would not have been so. Defendant, it is alleged, abused the re-training as a pretext to further injure Plaintiff for having reported DeBourge's sex-based misconduct towards him.

35.  After his termination, Plaintiff applied for unemployment benefits through the State of Michigan. Defendant opposed Plaintiff's claim for benefits by alleging supposed "gross misconduct" which was patently untrue. After three months, the State of Michigan Unemployment Insurance Agency rejected Defendant's claim that he had engaged in "gross misconduct" due to lack of evidence.

36.   On or about November 12, 2020 Plaintiff filed a charge of discrimination with the Equal Employment Opportunity Commission (the "EEOC").

37.   The EEOC issued a Notice of Right to Sue on April 29, 2021.


## COUNT 1 – RETALIATION
### *In Violation of the Title VII*

38.   Title VII prohibits discrimination by an employer "against any of his employees or applicants for employment" . . . "because such individual, . . . has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or litigation under [Title VII]."

39.   Plaintiff engaged in activity protected by Title VII when he

    a.   Complained to Defendant DeBourge about exposing him to homosexual pornography during the training and left the training to as to not continue to be exposed to same, and

    b.   Reported the pornography incident to Chief Pilot Mike Geadtke.

40.   Defendant Kalitta unlawfully retaliated against Plaintiff for engaging in his protected activity when it

    a.   Transferred Plaintiff from the Willow Run airport (45 minutes from his home) to Cincinnati Northern Kentucky international (4 hours from his home) as his place of report,

b. Began requiring him to sleep in a busy crew quarters instead of paying for a hotel,

c. Placing him in remedial training for a runway excusions that it *knew* or *should have known* was the fault of the other pilot and its own unsafe plane,

d. Applying a different, harsher, and unfair standard to him during the remedial training,

e. Assessing him a failure in the remedial training based on knowingly and intentionally false information,

f. Terminating his employment, and

g. Opposing his claim for unemployment based upon false and incorrect information.

41. All of the foregoing negative actions began almost immediately after his report of DeBourg's misconduct and continued through to his termination.

42. But for Plaintiff's report of DeBourg's conduct, Defendant's managers would not have subjected him to the retaliatory adverse conduct described above.

43. Plaintiff has suffered the following damages as a result of the Defendants' violation of his rights:

a. Lost back bay and benefits,

b. Lost front pay and benefits,

    c.  Emotional pain and distress,

    d.  Attorney's fees in opposing said violations.

44.  Plaintiff is also entitled to punitive damages, by reason of Defendants' willful and wanton violation of Plaintiff's rights.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff requests the following relief from this Honorable Court:

1. ECONOMIC DAMAGES including, but not necessarily limited to, lost back and front pay and benefits;

2. Such other COMPENSATORY damages as may be appropriate to compensate Plaintiff for Defendant's unlawful conduct;

3. PUNITIVE damages, in whatever amount the Court should deem appropriate,

4. ATTORNEY'S FEES, in an amount determined reasonable by the Court, so wrongfully incurred in order to remedy the violation of rights described herein;

5. Pre and post judgment interest at the appropriate statutory rate, and

6. Such other relief as this Court may deem just and appropriate in law or in equity.

### PLAINTIFF DEMANDS A JURY

Respectfully Submitted,

Dated:  9/12/2022          /s/ Collin H. Nyeholt
Collin H. Nyeholt,
Attorney for the Plaintiff