## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF MICHIGAN

| | |
|---|---|
| Terrance Edward Bar, | ) |
| | ) No. 2:21-cv-11444-PDB-DRG |
| Plaintiff, | ) |
| | ) Hon. Paul D. Borman |
| v. | ) |
| | ) Magistrate David R. Grand |
| Kalitta Charters II, LLC, | ) |
| | ) |
| Defendant. | ) |

## DEFENDANT KALITTA CHARTERS II, LLC'S
## FED R. CIV. P. 56 MOTION FOR SUMMARY JUDGMENT

NOW COMES Defendant, Kalitta Charters II, LLC ("Kalitta"), by and through its attorneys, Fitzpatrick, Hunt & Pagano, LLP and Kelsey Law Offices, and for its Fed. R. Civ. P. 56 Motion for Summary Judgment, states as follows:

1.     In this action, Plaintiff Terrance Bar alleges that Kalitta violated Title VII's anti-retaliation provision, 42 U.S.C. § 2000e-3.

2.     Pursuant to Fed. R. Civ. P. 56(c), Kalitta is entitled to Summary Judgment on Plaintiff's claims because:

a. None of the instances of retaliation in Plaintiff's Complaint, including Paragraphs 40(a)-40(g), were retaliatory as they arose from standard business practices. Moreover, only Plaintiff's termination could be considered "materially adverse" under the requisite standard;

b.  Plaintiff alleges Kalitta retaliated against him for a Complaint he made regarding former Kalitta employee Greg DeBourge showing him a pornographic video in a flight simulator, but none of the relevant decisionmakers were aware of this Complaint;

c.  Plaintiff cannot establish that his protected activity – his complaint about Mr. DeBourge – was the "but for" cause of the materially adverse actions alleged;

d.  Kalitta had a legitimate, non-retaliatory reason to terminate Plaintiff. Specifically, Plaintiff did not meet Kalitta's standards with respect to piloting the 737 aircraft.

3.    Pursuant to Local Rule 7.1(a), Kalitta sought concurrence of Plaintiff's counsel in the relief sought, but Plaintiff's counsel stated that he intends to oppose the instant motion. Plaintiff did agree to withdraw his contention that Kalitta contested his unemployment benefits as an act of retaliation, however.

**WHEREFORE**, Defendant Kalitta Charters II, LLC respectfully requests that this Honorable Court grant its Motion for Summary Judgment, dismiss Plaintiff's Second Amended Complaint in its entirety with prejudice, and award such other relief as the Court deems just and proper, including attorney's fees and costs.

Dated: May 4, 2023                     Respectfully submitted,

                                       FITZPATRICK, HUNT & PAGANO, LLP

By: s/ Nicholas C. Bart_____

Nicholas C. Bart
nick.bart@fitzhunt.com
FITZPATRICK, HUNT & PAGANO, LLP
10 South LaSalle St., Suite 3400
Chicago, IL 60603
(312)728-4901
State Bar No. 6257719 (IL)

and

George Kelsey
gkelsey@kelseylaw.com
State Bar No. P15855
KELSEY LAW GROUP, P.C.
Willow Run Airport
49710 Tyler Road Extension
Belleville, Michigan 48111
Telephone: (734) 973-1222
***Attorneys For Defendant***

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF MICHIGAN**

Terrance Edward Bar,                          )
                                              ) No. 2:21-cv-11444-PDB-DRG
      Plaintiff,                          )
                                              ) Hon. Paul D. Borman
v.                                            )
                                              ) Magistrate David R. Grand
Kalitta Charters II, LLC,                     )
                                              )
      Defendant.                          )

## DEFENDANT KALITTA CHARTERS II, LLC'S BRIEF IN SUPPORT OF FED R. CIV. P. 56 MOTION FOR SUMMARY JUDGMENT

## **TABLE OF CONTENTS**

TABLE OF AUTHORITIES .........................................................................iv

STATEMENT OF ISSUES PRESENTED...................................................vi

CONTROLLING OR MOST APPROPRIATE AUTHORITY FOR RELIEF
SOUGHT........................................................................................................ vii

I.     INTRODUCTION .......................................................................1

II.    STATEMENT OF MATERIAL FACTS ...................................1

      a.  Plaintiff transitions to become a 737 pilot ......................................1

      b.  Plaintiff begins his 737 training and complains to the Chief Pilot
         about being shown a pornographic video ........................................2

      c.  Plaintiff alleges his reassignment to CVG was retaliatory ..............4

      d.  Plaintiff alleges Kalitta retaliated against him for not providing
         him a hotel room. ...........................................................................5

      e.  Plaintiff alleges that Kalitta retaliated against him by not having an
         aircraft or Captain available for him at CVG. ................................6

      f.  No Captain available to him in PHX ...............................................7

      g.  Plaintiff was piloting an aircraft that veered off the runway ...........8

      h.  Plaintiff and Capt. Buchanan enter remedial training as a result of
         the veer-off event and Plaintiff alleges he was treated differently ..9

      i.  Plaintiff alleges that one of the Check Airmen, Rob Numbers, lied
         on his evaluation form as pretext ..................................................12

      j.  Plaintiff  alleges Kalitta contested his unemployment benefits .....12

III.    STANDARD OF REVIEW.......................................................12

IV.    ARGUMENT ....................................................................................13

    a.  Plaintiff cannot establish a *Prima Facie* case of retaliation
.......................................................................................................13

        i.    The only "materially adverse" action was Plaintiff's
termination ...........................................................................14

            1.  Plaintiff is reassigned from CVG to YIP ...............14

            2.  Kalitta did not provide Plaintiff a hotel
room at CVG ...........................................................14

            3.  Occasionally, no Captain or plane was
available to Plaintiff when he arrived at
CVG ...................................................................15

            4.  Plaintiff only flew out of PHX two times
when he was scheduled to fly for the entire
week .......................................................................16

            5.  Plaintiff was treated disparately after a June
2022 veer-off event .................................................16

            6.  Kalitta terminated Plaintiff due to false
information from Check Airman Rob
Numbers ..................................................................17

        ii.   Plaintiff's exercise of his protected right was not
known to the relevant decision makers who alleged
retaliated against him ............................................................18

        iii.  Plaintiff cannot establish a causal connection ....................19

    b.  Kalitta had a legitimate, non-retaliatory reason to
terminate Plaintiff............................................................................20

        i.    Mr. Numbers' alleged false evaluation was not
pretext .................................................................................24

## <u>TABLE OF AUTHORITIES</u>

**Cases**

*Anderson v. Liberty Lobby, Inc.,*
    477 U.S. 242 (1986)........................................................................12

*Burlington N. & Santa Fe Ry. Co. v. White,*
    548 U.S. 53 (2006)..........................................................................14

*Celotex Corp. v. Catrett,*
    477 U.S. 317 (1986)........................................................................13

*Dixon v. Gonzales,*
    481 F.3d 324 (6th Cir. 2007) ..........................................................19

*Evans v. Prof'l Transp., Inc.,*
    614 F. App'x 297 (6th Cir. 2015)....................................................18

*Frazier v. USF Holland, Inc.,*
    250 F. App'x 142 (6th Cir. 2007)....................................................18

*Hale v. Mercy Health Partners,*
    617 F. App'x 395 (6th Cir. 2015)....................................................25

*Iqbal v. Pinnacle Airlines, Inc.,*
    802 F. Supp. 2d 909 (W.D. Tenn. 2011) .........................................22

*Hedrick v. W. Re. Care Sy.,*
    355 F.3d 444 (6th Cir. 2004) ..........................................................20

*Majewski v. Automatic Data Processing, Inc.,*
    274 F.3d 1106 (6th Cir. 2001) ........................................................24

*McDonnell Douglas Corp. v. Green,*
    411 U.S. 792 (1973)..................................................................13, 20

*Morris v. Oldham Cty. Fiscal Court,*
    201 F.3d 784 (6th Cir. 2000) ..........................................................20

*Mulhall v. Ashcroft,*
    287 F.3d 543 (6th Cir. 2002) ..........................................................18

*Redlin v. Grosse Pointe Pub. Sch. Sys.,*
    921 F.3d 599 (6th Cir. 2019) ..........................................................13

*Rogers v. Henry Ford Health Sys.,*
    897 F.3d 763 (6th Cir. 2018) ..........................................................14

*Smith v. Chrysler Corp.,*
    155 F.3d 799 (6th Cir. 1998) ..........................................................25

*Univ. of Tex. Sw. Med. Ctr. v. Nassar,*

570 U.S. 338, 362 (2013) ...............................................................................19

**Rules**

Fed. R. Civ. P. 56 ....................................................................................1,12

**Statutes**

42 U.S.C. § 2000e-3 ....................................................................................1

## <u>STATEMENT OF ISSUES PRESENTED</u>

I.   Has Plaintiff presented admissible evidence that the relevant decisionmakers knew of his prior protected activity, which is an essential element of his *prima facie* case? If not, summary judgment on Plaintiff's Title VII Retaliation claim is mandated.

Defendant's answers: NO

II.  Can Plaintiff establish, through admissible evidence, that his protected activity was a but-for cause of the alleged adverse actions, which is an essential element of his *prima facie* case? If not, summary judgment on Plaintiff's Title VII Retaliation claim is mandated.

Defendant's answers: NO

III. Has Kalitta presented admissible evidence to establish that it had a legitimate, non-retaliatory reason to terminate Plaintiff for his failure to demonstrate proficiency piloting the 737 aircraft? If so, summary judgment on Plaintiff's Title VII Retaliation claim is mandated.

Defendant's answers: YES

IV.  Can Plaintiff establish, through admissible evidence, that Kalitta's reliance on Check Airman Rob Numbers' alleged false evaluation was pretext for his termination? If not, summary judgment on Plaintiff's Title VII Retaliation claim is mandated.

Defendant's answers: NO

## <u>CONTROLLING OR MOST APPROPRIATE<br>AUTHORITY FOR RELIEF SOUGHT</u>

ISSUE I: *Evans v. Prof'l Transp., Inc.*, 614 F. App'x 297, 300 (6th Cir. 2015) (requiring that the relevant decisionmaker have actual knowledge of protected activity for a plaintiff to establish retaliation)

ISSUE II: *Univ. of Tex. Sw. Med. Ctr. v. Nassar*, 570 U.S. 338, 362 (2013) (requiring plaintiff to establish that his/her protected activity was a "but-for" cause of the alleged adverse action)

ISSUE III: *Iqbal v. Pinnacle Airlines, Inc.*, 802 F. Supp. 2d 909, 922-24 (W.D. Tenn. 2011) (finding that a pilot's lack of proficiency during training is a legitimate, non-retaliatory reason for termination in a Title VII case)

ISSUE IV: *Majewski v. Automatic Data Processing, Inc.*, 274 F.3d 1106, 1117 (6th Cir. 2001) (holding that as long as an employer has an "honest belief" that its proffered non-discriminatory reason for discharging an employee, the employee cannot establish pretext merely because the reason is shown to be incorrect)

# I. <u>INTRODUCTION</u>

This Title VII retaliation case arises from Plaintiff's termination as a pilot with Kalitta after he caused an aircraft accident and then failed to pass remedial training. Plaintiff denies his termination was related to the accident and subsequent training failures. Rather, he claims the termination, as well as various other incidents alleged in his Complaint, were in retaliation for his reporting that another employee showed him a dirty joke on his cell phone six months earlier. As set forth more fully herein, Plaintiff has no evidence to support any of his claims and summary judgment is appropriate as a matter of law.

# II. <u>STATEMENT OF MATERIAL FACTS</u>

### a. **Plaintiff transitions to become a 737 pilot**

1. Kalitta is an air charter operator based out of Ypsilanti, Michigan. [Ex. A, Dkt. 33, Compl. at ¶ 3].

2. Kalitta hired Plaintiff as a pilot for its fleet of DC-9 aircraft in March of 2018. [*Id.* at ¶ 7; Ex. B, Pltf. Dep. at 11:7-8, 12:23-13:11]. As a DC-9 pilot, Plaintiff flew cargo on an ad hoc[1] basis on the DC-9 from Kalitta's home base at Willow Run Airport in Ypsilanti, Michigan ("YIP"). [*Id.*]

3. In 2019, Kalitta announced that it would be retiring its entire DC-9 fleet and advised all its DC-9 pilots, including Plaintiff, that they would be given the

---

[1] Ad hoc flying is conducting unscheduled, on-demand flights.

opportunity to transition to piloting Kalitta's fleet of 737 aircraft. [Ex. B, Pltf. Dep. at 13:12-18; Ex. D, Handlon Decl. at ¶ 8]. Plaintiff started his transition training on January 8, 2020.

### b. Plaintiff begins his 737 training and complains to the Chief Pilot about being shown a pornographic video

4.      In February 2020, after completing ground school, Plaintiff advanced to 737 training in a flight simulator - a machine resembling the cockpit of an aircraft, with images that mimic the pilot's view and mechanisms that imitate the aircraft's motion. [Ex. B, Pltf. Dep. at 14:25-15:11]. During a break from a simulator training session on February 21, 2020, Greg DeBourge, a Check Airman[2] employed by Kalitta, showed Plaintiff and his simulator partner a joke that included a clip from a pornographic video on his cellular phone. [*Id.* at 47:21-48:13, 50:18-51:5; Ex. A, Dkt. 33, Compl. at ¶¶ 9-12]. Plaintiff was disturbed by this and called Kalitta's Director of Training, Darrell Coleman, but did not reach him and left a voice message asking for him to call him back. [Ex. B, Pltf. Dep. at 48:21-49:2, 53:1-20].

5.      Plaintiff next called Kalitta's Chief Pilot, Mike Gaedtke, and told him what he had experienced. [Ex. A, Dkt. 33, Compl. ¶¶ 17-18; Ex. B, Pltf. Dep. at 49:3-49:16, 53:21-54:15]. After speaking to the Plaintiff on the phone, Mr. Gaedtke

---

[2] A Check Airman is "a person who is qualified to conduct flight checks in an aircraft, in a flight simulator, or in a flight training device for a particular type aircraft." 14 C.F.R. § 135.337(a)(1).

came to the training facility, listened to Plaintiff's complaint about Mr. DeBourge, and gave Plaintiff his car keys so he could go back to his hotel room for the day, which Plaintiff did. [*Id.*]

6.     This is the only time Plaintiff complained to anyone about the incident or told anyone about his complaint during his tenure at Kalitta, and he does not know whether Mr. Gaedtke told anyone about the complaint. [Ex. B, Pltf. Dep. at 56:19-57:12, 60:23-61:2, 144:14-16].

7.     Mr. Gaedtke found Mr. DeBourge's behavior to be inappropriate and addressed the incident with him directly while at the simulator. [Ex. E, Gaedtke Decl. at ¶ 8]. He admonished Mr. DeBourge for his lack of professionalism and directed him not to engage in such behavior. [*Id.*]

8.     Mr. Gaedtke did not tell anyone about Plaintiff's complaint, save for addressing it directly with Mr. DeBourge. [*Id.* at ¶ 10].

9.     Plaintiff alleges that his complaint about Mr. DeBourge's behavior is the sole reason for the alleged retaliation. [Ex. B, Pltf. Dep. at 57:13-58:10].

10.     Plaintiff resumed his simulator training the following day and passed his proficiency check[3] on February 23, 2020. He then entered the initial operating experience ("OE") phase of the transition training[4]. [*Id.* at 15:8-21].

11.     In the OE phase, a Check Airman evaluates the pilot's ability to operate a 737 during actual flight in accordance with Federal Aviation Administration ("FAA") criteria. [Ex. B, Pltf. Dep at 15:22-16:1, 16:13-23; Ex. C, Coleman Decl. at ¶¶ 12, 23].

12.     A Check Airman signed off on Plaintiff's initial OE on March 27, 2020. [Ex. B, Pltf. Dep. at 17:9-19].  Plaintiff was then released to fly as a First Officer on the 737 without observation. [*Id.* at 16:24-17:8]. Plaintiff's first unsupervised flight was on April 9, 2020. [*Id.* at 19:20-24].

### c.  Plaintiff alleges his reassignment to CVG was retaliatory

13.     Plaintiff alleges that after he became a 737 pilot, Kalitta retaliated against him by changing his place of reporting from Willow Run Airport in Ypsilanti, Michigan ("YIP"), which is a 45-minute drive from Plaintiff's home, to

---

[3] A "proficiency check" or "check ride" is an evaluation of a pilot's skills and knowledge in a specific type of aircraft, as required by the FAA. [Ex. C, Coleman Decl. at ¶ 9]. It is administered by an FAA-approved examiner - typically a Check Airman – to ensure that a pilot meets all relevant regulatory and company standards for proficiency in operating the given aircraft. [*Id.* at ¶¶ 9-10].

[4] Even if a pilot passes his "check ride," that pilot must still successfully complete at least 25 hours of initial operating experience flying in an actual aircraft with an actual crew to be released to fly unsupervised. [Ex. C, Coleman Decl. at ¶¶ 12, 23]

Cincinnati Northern Kentucky International Airport (CVG), which is approximately a four-hour drive from his home. [Ex. A, Dkt. 33, Compl. at ¶¶ 21, 40(a)].

14.     After Kalitta's DC-9s were retired and Plaintiff transitioned to the 737, no 737 aircraft were based at YIP for ad hoc flying, as the DC-9 aircraft had been. [Ex. D, Handlon Decl. at ¶¶ 9, 22, citing Ex. D-2, 737 Schedule]. As such, there was no YIP-based 737 aircraft available for Plaintiff or any other transitioning DC-9 pilots. [*Id.*] In fact, no 737 pilots were assigned to fly out of YIP while Mr. Bar was piloting 737 aircraft for Kalitta as there were no routes originating out of YIP. [*Id.*]

15.     Kalitta uses some of its 737 aircraft to fly cargo for logistics company DHL. [*Id.* at ¶ 10]. Those flights originate from a few different locations, including CVG, which is why Plaintiff was assigned to CVG upon becoming a 737 pilot. [*Id.*]

### d. Plaintiff alleges Kalitta retaliated against him by not providing him a hotel room at CVG

16.     Plaintiff alleges that Kalitta "[b]egan requiring him to sleep in a busy crew quarter instead of paying for a hotel" when he was assigned to CVG after becoming a 737 pilot. [Ex. A, Dkt. 33, Compl. at ¶¶ 22, 40(b)].

17.     On arrival at CVG, all Kalitta pilots are required to wait while the cargo is sorted and transferred from the DHL aircraft to the Kalitta aircraft (the "sort"). [Ex. B, Pltf. Dep. at 79:10-80:7; Ex. D, Handlon Decl. at ¶ 11]. The sort typically takes 4-5 hours. [*Id.*] During the sort, all Kalitta pilots would wait in a furnished

pilot lounge where they can eat, watch TV, or sleep in recliners. [*Id.*] Once the sort was complete, Kalitta's pilots flew the packages to their next destination. [*Id.*]

18.     Plaintiff acknowledges that when he started flying out of CVG, he and other Kalitta pilots would wait in the crew room during the sort. [Ex. B, Pltf. Dep. at 81:21-82:10; 84:10-12]. Then, in August 2020, Plaintiff saw two Kalitta Captains who were going to wait out the sort in a hotel room rather than the crew room. [*Id.* at 80:8-81:4, 82:11-83:12].

19.     After speaking with the Captains, Plaintiff called the Kalitta dispatcher, requested a hotel room, and immediately received one. [*Id.* at 83:1-15, 83:23-84:1]. He also received a hotel room for the rest of his tenure at Kalitta. [*Id.*].

20.     Plaintiff contends that Kalitta's failure to unilaterally provide him a hotel room was an act of retaliation. [*Id.* at 84:13-23].

21.     Typically, all Kalitta pilots were required to wait in the crew lounge during the sort. [Ex. D, Handlon Decl. at ¶ 12]. During the COVID-19 pandemic, some pilots started requesting hotel rooms during the sort as an accommodation to limit their exposure and were given one upon request. [*Id.*] At no point were some pilots automatically assigned to hotel rooms while others were not. [*Id.*] Rooms were assigned by request before ultimately being assigned to all pilots. [*Id.*]

   **e. Plaintiff alleges that Kalitta retaliated against him by not having an aircraft or Captain available for him at CVG**

22.     Plaintiff alleges that when flying out of CVG, he occasionally reported to CVG only to find no aircraft or Captain was available for him, so he could not fly. [Ex. A, Dkt. 33, Compl. at ¶ 23; Ex. B, Pltf. Dep. at 86:18-25, 87:19-21]. He claims these were instances of retaliation. [*Id.*]

23.     Kalitta pilots do not always fly when they are scheduled for duty. In the aviation industry, pilots sometimes cannot fly their scheduled routes due to sickness, familial obligations, weather delays, exceeding their maximum duty time, or a host of other reasons. [Ex. D, Handlon Decl. at ¶ 23]. To ensure that scheduled flights still proceed, Kalitta and other aircraft operators schedule pilots as "reserves" or "spares." [*Id.*] This means that they are not assigned to a specific flight but are available at a given flight's point of origin if needed. [*Id.*] Mr. Bar was often scheduled as a "spare." [*Id.*, citing Ex. D-2, 737 Schedule]. Spare pilots are provided a hotel room and receive full pay regardless of whether they fly. [*Id.*]

24.     In the aviation cargo business, it is not uncommon for schedules to change for any number of reasons, including, but not limited to, aircraft maintenance issues, weather delays, pilot cancellations, flight time minimums or maximums, or a host of other reasons. [*Id.* at ¶ 17].

25.     Plaintiff, and all other Kalitta pilots, are still fully compensated for the flights they do not actually conduct, per company policy. [*Id.*]

**f.  No Captain available to him in PHX**

26.     Plaintiff further alleges that he was scheduled to fly out of PHX for a week, but when he arrived, he did not fly all his scheduled days, which he claims was an act of retaliation. [Ex. A, Dkt. 33, Compl. at ¶ 24].

27.     Plaintiff did not fly all his scheduled PHX flights because Kalitta needed to get another pilot flight time. [Ex. D, Handlon Decl. at ¶ 16, citing Ex. D-1, Scheduling Emails]. This is reflected in emails from crew scheduler Rachel Brewer to Plaintiff, which state: "[P]lease just sit on standby so we can let Ryan Sims fly a few days. Thank you for your understanding." [*Id.*] Plaintiff replied: "Ok sounds good Rachel."[5] [*Id.*]

28.     Plaintiff received his full pay on those days he was not required to fly. [Ex. B, Pltf. Dep. at 94:5-95:5, 115:10-11, 166:19-167:1].

### g.  Plaintiff was piloting an aircraft that veered off the runway

29.     On June 5, 2020, Plaintiff was the pilot flying a Kalitta 737 departing from Rochester, NY (KROC) when the aircraft veered off the runway and into the grassy infield on takeoff. [Ex. A, Dkt. 33, Compl. at ¶¶ 25-27; Ex. B, Pltf. Dep. at 115:18-118:23]. The veer off event resulted in significant damage to the aircraft.

30.     Kalitta determined that the veer-off was caused by Mr. Bar's lack of understanding with respect to the 737's automation. [Ex. C, Coleman Decl. at ¶ 16].

---

[5] Mr. Sims was returning from medical leave after suffering a broken foot and needed to acquire flight time in order to maintain his currency.

Specifically, Mr. Bar engaged the aircraft's autothrottle before the two wing-mounted engines spooled up evenly. [*Id.*] This caused one of the aircraft's engines to produce more power than the other (asymmetric thrust), which in turn caused the aircraft to yaw (turn) in one direction and direct the aircraft off the runway. [*Id.*]

31.    Kalitta also determined that the Captain, Marcris Buchanan ("Capt. Buchanan") was at fault. [*Id.* at ¶17]. Specifically, Capt. Buchanan failed to follow appropriate procedures once the aircraft began to yaw off the runway. [*Id.*].

32.    Plaintiff denied responsibility for the accident and blamed Capt. Buchanan, as well as an unspecified maintenance issue with one of the engines. [Ex. A, Dkt. 33, Compl. at ¶¶ 25-27; Ex. B, Pltf. Dep. at 115:18-118:23, 119:15-20].

> **h.  Plaintiff and Capt. Buchanan enter remedial training as a result of the veer-off event and Plaintiff alleges he was treated differently**

33.    As a result of the June 5, 2020 veer off event, both Plaintiff and Capt. Buchanan were administratively disqualified from further flying per company policy and sent to for remedial training. [Ex. C, Coleman Decl. at ¶ 17]. Plaintiff alleges that he was subject to disparate remedial training compared to Capt. Buchanan as an act of retaliation. [Ex. A, Dkt. 33, Compl. at ¶¶ 25-28].

34.    As a result of the incident, Kalitta implemented additional veer-off training into its curriculum to prevent the situation from happening again. [Ex. C, Coleman Decl. at ¶ 19]. On June 11, 2020, Kalitta provided this training to both pilots in a simulator, and both successfully completed the training. [*Id.* at ¶ 20, citing

Exs. C-1, C-2]. On June 12, 2020, Kalitta performed a proficiency check of the pilots and neither pilot was proficient enough to pass. [Ex. E, Gaedtke Decl. at ¶ 15].

35.    Due to the pilots' performance, Mr. Gaedtke decided additional remedial training was necessary. [*Id.* at ¶ 15]. Both pilots completed remedial ground school on June 22-23, 2020 and were sent for another proficiency check in the simulator. [Ex. C, Coleman Decl. at ¶ 20, citing Exs. C-1, C-2]. Capt. Buchanan passed his proficiency check on July 1, 2020, and Plaintiff passed his check with Check Airman DeBourge on July 14, 2020. [*Id.*]

36.    As a result of the veer-off incident and his subsequent performance during remedial training, Capt. Buchanan was demoted to First Officer and returned to the line where he had to fly under the supervision of a Captain. [*Id.* at ¶ 30]. He later underwent remedial OE to regain his status as a Captain and passed it on September 8, 2020 after completing over 25 hours of OE. [*Id.*]

37.    On July 24, 2020, Plaintiff was assigned to fly remedial OE so he could demonstrate he was capable of returning to the line, unsupervised, as a First Officer. [*Id.* at ¶ 20, citing Ex. C-1, ¶ 23]. Plaintiff's initial performance during his remedial OE after was unsatisfactory, which is grounds for termination. [*Id.* at ¶ 24]. Rather than terminate Mr. Bar at that time, Mr. Coleman decided to allow him to continue his remedial OE with a different Check Airman to provide him an additional opportunity to demonstrate the requisite proficiency in the aircraft. [*Id.*]

38.     Once Plaintiff hit 23 hours of remedial OE flight time and had been evaluated by three different Check Airmen, Mr. Coleman sent an email to the Check Airmen to get an update on his progress. [*Id.* at ¶ 27]. None of them signed off on Mr. Bar's OE as satisfactory. [*Id.*]

39.     Rather than terminate him, Mr. Coleman decided to allow Mr. Bar to continue flying remedial OE with the first Check Airman who evaluated him (Rob Numbers). [*Id.*] Mr. Numbers noted that Plaintiff continued to struggle during his additional 14 hours of remedial OE. [*Id.*]

40.     Plaintiff was paid at his normal rate during the entirety of the remedial training and all expenses incurred during the training, including flights and lodging in Florida, meals, and time in the simulator, were paid by Kalitta. [*Id.* at ¶¶ 21-22].

41.     Based on the totality of the information contained in the reports Mr. Coleman received from all three Check Airmen who evaluated Plaintiff during almost 40 hours of OE, Mr. Coleman decided that, in his informed professional judgment, Plaintiff was not adequately progressing in adapting to the 737's complexities, including the automation that was not present on the DC-9 aircraft Mr. Bar originally piloted. [*Id.* at ¶¶ 28-29].

42.     While multiple individuals provided input on Mr. Bar's performance, it was Mr. Coleman's decision to terminate Mr. Bar. [*Id.*] Mr. Coleman did not know about Plaintiff's complaint about Mr. DeBourge at that time. [*Id.* at ¶ 8].

### i.   Plaintiff alleges that one of the Check Airmen, Rob Numbers, lied on his evaluation form as pretext

43.     Plaintiff alleges that one of Check Airman who conducted his remedial OE, Rob Numbers, made false statements on his evaluation form at the behest of Kalitta, who knowingly relied on the false information in assessing him as a failure in remedial training. [Ex. A, Dkt. 33, Compl. at ¶¶ 29, 34, 40(e); Ex. B, Pltf. Dep. at 141:6-12, 143:3-6].

44.      Plaintiff admits he has no evidence Kalitta instructed Mr. Numbers to make inaccurate or false statements and no information to suggest that Mr. Numbers knew about his complaint regarding Mr. DeBourge. [Ex. B, Pltf. Dep. at 143:11-19]. Rather, he merely relies on his "feeling that they got Numbers on board." [*Id.* at 145:25-146:9].

### j.   Plaintiff alleges Kalitta contested his unemployment benefits

45.    Plaintiff withdrew this contention after a Rule 7.1(a) conference seeking concurrence in the instant motion.

### III.   <u>STANDARD OF REVIEW</u>

Under Fed. R. Civ. P. 56, the Court must determine "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251-52 (1986). Moreover, Rule 56 "mandates the entry of summary judgment…, against a party who fails to make a showing sufficient to

establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). The burden on the moving party to produce evidence of an absence of an issue of material fact "may be discharged by 'showing' -- that is, pointing out to the district court -- that there is an absence of evidence to support the nonmoving party's case." *Id.* at 325.

## IV. <u>ARGUMENT</u>

### a.  Plaintiff Cannot Establish a *Prima Facie* Case of Retaliation

Title VII retaliation claims may be proved with direct evidence, or indirect evidence via the *McDonnell Douglas* framework if no direct evidence is present. *Redlin v. Grosse Pointe Pub. Sch. Sys.*, 921 F.3d 599, 613 (6th Cir. 2019) (*citing McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802-803 (1973)). Since Plaintiff presented no direct evidence of discrimination, he must use the *McDonnell Douglas* framework. To survive summary judgment under this standard, Plaintiff must first demonstrate a *prima facie* case of retaliation by showing: "(1) [he] engaged in activity protected by Title VII; (2) [his] exercise of such protected activity was known by the defendant; (3) thereafter, the defendant took an action that was 'materially adverse' to the plaintiff; and (4) a causal connection existed between the protected activity and the materially adverse action." *Redlin*, 921 F.3d at 613. If Plaintiff establishes a *prima facie* case, the burden of production shifts to Kalitta to

provide a "legitimate, non-retaliatory reason for the termination" *Id.* If Kalitta satisfies this burden, the burden shifts back to Plaintiff to show that the proffered reason was a pretext for retaliation. *Id.* Plaintiff cannot establish elements (2)-(4) of his *prima facie* case.

### i.  The only "materially adverse" action was Plaintiff's termination

For an action to be materially adverse, "plaintiff must show that a reasonable employee would have found the challenged action materially adverse, which in this context means it well might have dissuaded a reasonable worker from making or supporting a charge of discrimination." *Rogers v. Henry Ford Health Sys.*, 897 F.3d 763, 776 (6th Cir. 2018) (*quoting Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 64 (2006)). Kalitta acknowledges Plaintiff's termination can be considered materially adverse, but the remaining allegations of retaliation are not because they constituted normal business operations.

### 1.  *Plaintiff is reassigned to CVG from YIP [SOF at ¶ 13]*

Before transitioning from the DC-9 to the 737, Plaintiff's flights originated from YIP. [SOF at ¶ 2]. After the DC-9s were retired and Plaintiff transitioned to the 737, none of Kalitta's 737 flights originated from YIP. [SOF at ¶ 14]. There was no longer a scheduled route for Plaintiff or any other former DC-9 pilot originating in YIP and his reassignment was not "materially adverse" or retaliatory. [SOF at ¶ 14].

### 2.  *Kalitta did not provide Plaintiff a hotel room at CVG [SOF at ¶¶ 16, 20]*

14

Plaintiff testified that when he started flying out of CVG, he and all other Kalitta pilots would wait in the crew room during the sort. [SOF at ¶ 18]. Later, he saw two Captains going to a hotel while he was headed to the crew lounge. [SOF at ¶ 18]. This is the only evidence Plaintiff cites that Kalitta retaliated against him by not automatically assigning him a hotel room. This is despite the fact that he did not know whether hotel rooms were assigned or requested at the time or whether there were any First Officers (as opposed to Captains) who were given a hotel room. [Ex. B, Pltf. Dep. at 83:16-22, 84:24-85:18].

No pilot was automatically assigned a hotel room. A few Kalitta pilots requested hotel rooms as an accommodation during the COVID-19 pandemic and were given one. [SOF at ¶ 21]. When Plaintiff requested one, he was immediately assigned one and had one for the rest of his time at Kalitta. [SOF at ¶ 19]. Kalitta's policy of granting all pilot requests for an accommodation (a hotel room) during the pandemic cannot establish materially adverse or retaliatory conduct.

### 3. Occasionally, no Captain or plane was available to Plaintiff when he arrived at CVG [SOF at ¶ 22]

Plaintiff not flying his assigned route at CVG was a normal occurrence. Plaintiff and other pilots were routinely scheduled as spares (backups), who are not intended to fly unless needed, and flight schedules change for a host of other, non-retaliatory reasons, such as aircraft maintenance issues and weather. [SOF at ¶ 23]. Moreover, Plaintiff was still fully compensated for the flights he did not actually

conduct. [SOF at ¶¶ 23, 25]. As such, no reasonable employee would have found these events materially adverse.

### 4. Plaintiff only flew out of PHX two times when he was scheduled to fly for the entire week [SOF at ¶ 26]

Plaintiff did not fly all his scheduled flights out of PHX because another Kalitta pilot needed to log flight time, as documented in the attached emails. [SOF at ¶ 27]. When confronted with this evidence, Plaintiff admitted that he does not still believe this was an instance of retaliation [Ex. B, Pltf. Dep. at 114:16-115:4 ("I didn't really pinpoint Phoenix as, you know, a retaliatory event. … So, to say it's retaliatory is anybody's guess.")]. Moreover, he was still fully compensated for every day he didn't fly. [SOF at ¶ 28]. There was a legitimate business reason Plaintiff did not fly the whole week and the event was not materially adverse.

### 5. Plaintiff was treated disparately after a June 2022 veer-off event [SOF at ¶ 33]

Kalitta determined that both Plaintiff and Capt. Buchanan were at fault for the June 5, 2022 veer-off event and assigned them both to remedial training. [SOF at ¶¶ 29-33]. The following chart demonstrates that the training was not disparate.

| Bates # | Result | BUCHANAN -- Date | EVENT | BAR -- Date | Result | Bates # |
|---|---|---|---|---|---|---|
| 2813 | Satifactory | 6/11/2020 | Siimulator -- Veer Off  TRAINING | 6/11/2020 | Satisfactory | N/A(Pg. 1) |
| 2814 | Incomplete | 6/12/2020 | Similator -- Proficiency CHECK (PC) | 6/12/2020 | Incomplete | 2777 |
| 2815 | attended | 6/22/2020 | Remedial Ground School | 6/22/2020 | attended | 2769 |
| 2816 | attended | 6/23/2020 | | 6/23/2020 | attended | 2770 |
| 2817 | Satifactory | 6/23/2020 | Instructor Sign off for Ground School | 6/23/2020 | Satisfactory | 2768 |
| 2818 | Satifactory | 7/1/2020 | Similator -- Proficiency CHECK (PC) | 7/14/2020 | Satisfactory | 2775 |
| | | Assigned as F/O* | | Assigned as F/O** | | |
| 2820 | Satifactory | 09/01/2020 - 09/08/2020 | Operating Experience (OE) | 7/24/2020 - 8/20/2020 | Incomplete | 2773 |
| | | 25:20 hours total | 25:00 hours minimum | 37:29 hours total | | |

[Ex. C, Coleman Decl. at ¶ 20]. Plaintiff and Capt. Buchanan had the same training and results until after they passed their second proficiency checks on July 1 and 14, 2020, respectively. [*Id.*] At that point, Capt. Buchanan was <u>demoted</u> to First Officer and underwent 25 hours of remedial OE to regain his Captain's seat. [*Id.*; SOF at ¶ 36]. Plaintiff went directly to remedial OE as a First Officer to be evaluated to return to flying unsupervised. [SOF at ¶ 37]. Plaintiff was given over 37 hours of flight time to be evaluated independently by three different Check Airmen but could not pass OE. [SOF at ¶¶ 37-41]. No disparate remedial training is present; Plaintiff merely failed to perform to standard.

>    6. *Kalitta terminated Plaintiff due to false information from Check*
>       *Airman Rob Numbers [SOF at ¶ 43]*

Plaintiff admits he has no evidence that Kalitta instructed Mr. Numbers to make inaccurate or false statements. [SOF at ¶ 44]. He also admits he has no evidence that Mr. Numbers knew about his Complaint to Mr. Gaedtke. [SOF at ¶ 44]. Rather, he just "ha[d] a feeling that they got Numbers on board." [SOF at ¶ 44]. There is no evidence that Kalitta's reliance, if any, was retaliation.

### ii. Plaintiff's exercise of his protected right was not known to the relevant decision makers who allegedly retaliated against him

"The decisionmaker's knowledge of the protected activity is an essential element of the prima facie case of unlawful retaliation." *Frazier v. USF Holland, Inc.*, 250 F. App'x 142, 148 (6th Cir. 2007). Plaintiff must establish such knowledge with "'specific facts' and not merely 'conspiratorial theories,' 'flights of fancy, speculations, hunches, intuitions, or rumors.'" *Evans v. Prof'l Transp., Inc.*, 614 F. App'x 297, 300 (6th Cir. 2015) (*quoting Mulhall v. Ashcroft*, 287 F.3d 543, 552 (6th Cir. 2002). "General corporate knowledge" is also insufficient; there must be evidence that the actual decisionmaker knew of the protected activity. *Id.* (*citing Frazier*, 250 F. App'x at 148). Here, there is no evidence that the relevant decisionmakers knew of Plaintiff's complaint to Mr. Gaedtke.

Plaintiff cannot identify anyone besides Mr. Gaedtke who knew of his Complaint. [SOF at ¶ 6]. Mr. Gaedtke did not tell anyone about Plaintiff's Complaint, save for addressing the issue directly with Mr. DeBourge. [SOF at ¶ 8]. Importantly, the decision to terminate Plaintiff was made exclusively by Mr. Coleman, who did not know about Plaintiff's Complaint. [SOF at ¶ 42].

Similarly, there is no evidence that the decision makers, if any, in Plaintiff's other claims of retaliation were aware of his complaint:

- Plaintiff's assignment to CVG rather than YIP was not a decision made by any person. Rather, Kalitta did not have any 737 flights originating out of YIP, so assigning him to YIP was not an option. [SOF at ¶ 14].

- Failing to automatically provide Plaintiff a hotel room at CVG was not a decision made by any person. Rooms were assigned in response to individual pilot accommodation requests and Mr. Bar received one when requested. [SOF at ¶ 21].

- That occasionally no Captain or plane was available to Plaintiff at CVG/PHX was not a decision made by any person. It resulted from Plaintiff's status as a spare pilot or routine schedule changes common to all pilots. [SOF at ¶¶ 23-24, 27].

- As for Kalitta's reliance on Mr. Numbers' alleged false statements on his evaluation form, there is no evidence Mr. Numbers was aware of the complaint, and Mr. Coleman was not aware of it. [SOF at ¶¶ 42, 44].

None of the relevant decisionmakers, if any, knew of Plaintiff's Complaint and he cannot establish his *prima facie* case on that basis alone.

### iii.  Plaintiff cannot establish a causal connection

"To establish a causal connection, a plaintiff must 'proffer evidence sufficient to raise the inference that [their] protected activity was the likely reason for the adverse action.'" *Dixon v. Gonzales*, 481 F.3d 324, 333 (6th Cir. 2007). The plaintiff "must establish that his or her protected activity was a but-for cause of the alleged adverse action." *Univ. of Tex. Sw. Med. Ctr. v. Nassar*, 570 U.S. 338, 362 (2013).

As discussed above, there are no acts that can be considered retaliatory save for Plaintiff's ultimate termination, and even if they were, there is no evidence the actions resulted from Plaintiff's complaint. The decision to terminate Plaintiff was made exclusively by Mr. Coleman, who did not know about Plaintiff's complaint, severing any claim of causation. [SOF at ¶¶ 41-42].

## b.   Kalitta had a legitimate, non-retaliatory reason to terminate plaintiff

Even assuming Plaintiff could establish a *prima facie* case, his claim still fails because Kalitta had a legitimate, non-retaliatory reason for his termination. *See Morris v. Oldham Cty. Court*, 201 F.3d 784, 792 (6th Cir. 2000) (*quoting McDonnell Douglas*, 411 U.S. at 802). This analysis is limited to his termination because none of the other alleged instances of retaliation constitute an adverse action[6].

Kalitta terminated Plaintiff because it did not believe he could adequately pilot the 737 based on nearly 40 hours of remedial evaluation by multiple FAA-certified evaluators following his error that caused an aircraft accident in June 2022. "Importantly, [courts] must not second guess the business judgment of the employer, but simply evaluate whether the employer gave an honest explanation of its behavior." *Hedrick v. W. Re. Care Sy.*, 355 F.3d 444, 462 (6th Cir. 2004). Kalitta has a well-documented, honest explanation.

---

[6] To the extent the Court finds other materially adverse actions, Kalitta incorporates its explanations as to why those events occurred here as those explanations also constitute the legitimate, non-retaliatory reasons for those events.

Kalitta determined Plaintiff was at fault for the June 5, 2020 veer-off incident because he was the pilot flying the aircraft and engaged the aircraft's autothrottle before the two engines spooled up evenly, causing one engine to produce more power than the other (asymmetric thrust), which in turn caused the aircraft to yaw (turn) in one direction and direct the aircraft off the runway. [SOF at ¶ 30]. Kalitta takes such events very seriously out of concern for the public, the safety of its pilots, the cargo, and its multi-million dollar aircraft. Following the accident, the pilots were administratively disqualified from further flying while Kalitta administered the appropriate remedial evaluation and retraining. [SOF at ¶ 33].

When it was evident that neither pilot was going to pass their first post-incident proficiency check, Kalitta provided additional remedial training. [SOF at ¶¶ 34-35]. After further training, Plaintiff passed his next proficiency check and was sent to complete remedial OE so he could demonstrate proficiency in actual flight conditions. [SOF at ¶¶ 35, 37].

Plaintiff's initial performance during his remedial OE was unsatisfactory, which is grounds for termination. [SOF at ¶ 37]. Rather than terminate him, Kalitta gave him 23 hours of remedial OE with three Check Airmen to allow him to demonstrate the requisite proficiency. [SOF at ¶¶ 37-38]. Plaintiff alleges assigning him three Check Airmen was retaliatory. That is not the case. Check Airman are appointed by the FAA to evaluate pilots on its behalf according to its regulatory

criteria. [SOF at ¶¶ 4, 11]. Kalitta assigned three Check Airmen to allow for multiple, independent evaluations of Plaintiff's abilities and gather a consensus. [SOF at ¶¶ 37-41]. Ultimately, Plaintiff was given almost 40 hours of remedial OE to prove his abilities, but he was not up to standard. [SOF at ¶ 41]. Mr. Coleman thus decided, in his informed professional judgment, to terminate Plaintiff. [SOF at ¶¶ 41-42].

A very similar set of facts was seen in *Iqbal v. Pinnacle Airlines, Inc.*, 802 F. Supp. 2d 909 (W.D. Tenn. 2011). In *Iqbal*, a pilot alleged Title VII discrimination and retaliation claims against the defendant airline operator, Pinnacle. *Id.* 913. Like Plaintiff, the *Iqbal* pilot underwent intensive training, including ground school, simulator training, check rides, and OE. *Id.* at 916. The pilot also struggled during OE with numerous Check Airmen before the Director of Flying, relying on the plaintiff's training and OE records, made the decision to terminate him. *Id.* at 916-919. Before being terminated, the plaintiff complained about the final Check Airman who evaluated him during OE, but the Director of Flying was not aware of the complaint. *Id.* at 919.

Granting summary judgment, the court noted that it was uncontested that the Director of Flying and made the decision to terminate the plaintiff based solely on his review of plaintiff's training and OE records. *Id.* at 923. Specifically, plaintiff's

lack of proficiency with the glass cockpit[7]. *Id.* The court found that the Director of Flying's "decision to terminate Plaintiff was an informed, professional judgment made upon review of Plaintiff's evaluations after Plaintiff had been provided with numerous additional training opportunities and failed to show improvement," which was a legitimate and non-discriminatory reason for termination. *Id.* Moreover, the plaintiff's pretext argument was rejected because: 1) He had no evidence that the relevant decisionmakers knew of his complaint, and 2) the record established that he "was consistently failing his evaluations and requiring additional training before being signed off to the next level [and] [h]e was unable to satisfactorily pass OE." *Id.* at 924. This is the <u>exact</u> situation here and the same result is warranted.

In sum, after the June 5, 2020 veer-off incident, Kalitta expended significant time and expense to keep Plaintiff as a pilot, including: 1) flying him to Florida for veer-off training and a simulator check ride, 2) providing two full days of remedial ground school, 3) providing additional time in a simulator for his check ride, and 4) providing <u>37 hours</u> of observed flight with three different Check Airman providing input for his remedial OE. Plaintiff received his full income during this time. [SOF at ¶ 40]. Despite the extra training, Plaintiff failed to demonstrate satisfactory piloting proficiency once he transitioned from the DC-9 to the more complex 737.

---

[7] A "glass cockpit" is a cockpit with digital, electronic displays rather than traditional gauges for each instrument, which adds complexity for unfamiliar pilots.

[SOF at ¶¶ 41]. No reasonable jury could believe that Kalitta spent that much time, money, and effort on Plaintiff's training in an elaborate conspiracy to retaliate against him for reporting that another employee showed him a dirty joke six months earlier. Plaintiff was terminated based on his unsatisfactory piloting ability after causing an accident and nothing more.

### i. Mr. Numbers' alleged false evaluation was not pretext

Plaintiff alleges Kalitta used Check Airman Rob Numbers' false and inaccurate evaluation of him as pretext to terminate him. [SOF at ¶ 43]. Plaintiff admits he has no evidence that Kalitta instructed Mr. Numbers to make false statements or that Mr. Numbers knew about his complaint regarding Mr. DeBourge. Moreover, Mr. Coleman's decision to terminate Plaintiff was based on the input of numerous Check Airmen. [SOF at ¶¶ 37-42]. Check Airmen are approved by the FAA, to act on its behalf, and must adhere to FAA criteria when conducting their evaluations. [Ex. C, Coleman Decl. at ¶¶ 9-12]. Individuals like Mr. Coleman, who are not in the cockpit during the evaluations, have to rely on the Check Airmen's assessment. This is fatal to Plaintiff's pretext argument.

Under the "honest belief" rule, "as long as an employer has an honest belief in its proffered nondiscriminatory reason for discharging an employee, the employee cannot establish that the reason was pretextual simply because it is ultimately shown to be incorrect." *Majewski v. Automatic Data Processing, Inc.*, 274 F.3d 1106, 1117

(6th Cir. 2001) (*citing Smith v. Chrysler Corp.*, 155 F.3d 799, 806-07 (6th Cir. 1998)). "An employer has an honest belief in its reason for discharging an employee where the employer reasonably relied 'on the particularized facts that were before it at the time the decision was made.'" *Id.* (*citing* same). "Indeed, an employer's belief can still be reasonably informed—and therefore honest—even if it 'is ultimately found to be mistaken, foolish, trivial, or baseless.'" *Hale v. Mercy Health Partners*, 617 F. App'x 395, 401 (6th Cir. 2015) (*quoting Smith*, 155 F.3d at 806).

To the extent Plaintiff argues falsity, it is of no matter because Mr. Coleman honestly relied on numerous, independent evaluations of Plaintiff after extensive retraining efforts along with his own experience to make his decision to terminate Plaintiff. Plaintiff's expected pretext argument therefore fails.

Dated: May 4, 2023                    Respectfully submitted,

                                     FITZPATRICK, HUNT & PAGANO,
                                     LLP

                                     By: s/ Nicholas C. Bart

George Kelsey                        Nicholas C. Bart
gkelsey@kelseylaw.com                nick.bart@fitzhunt.com
State Bar No. P15855                 FITZPATRICK, HUNT & PAGANO,
KELSEY LAW GROUP, P.C.               LLP
Willow Run Airport                   10 South LaSalle St., Suite 3400
49710 Tyler Road Extension           Chicago, IL 60603
Belleville, Michigan 48111           (312) 728-4901
Telephone: (734) 973-1222            State Bar No. 6257719 (IL)
Attorneys For Defendant

## CERTIFICATE OF SERVICE

I, Nicholas C. Bart, certify that on May 4, 2023, I electronically filed the foregoing *DEFENDANT KALITTA CHARTERS II, LLC's FED R. CIV. P. 56 MOTION FOR SUMMARY JUDGMENT AND MEMORANDUM IN SUPPORT THEREOF* with the Clerk of the Court using the CM/ECF system, which will send notification of such filing to counsel of record.

I certify under penalty of perjury that the foregoing is true and correct.

DATED this 4th day of May 2023

<div style="margin-left:40%">

s/ Nicholas C. Bart

**FITZPATRICK, HUNT & PAGANO, LLP**
10 South LaSalle St., Suite 3400
Chicago, IL 60603
(312)728-4901
State Bar No. 6257719 (IL)

</div>

George W. Kelsey
gkelsey@kelseylaw.com
Karen L. Girard
kgirard@kelseylaw.com
**KELSEY LAW GROUP, P.C.**
49710 Tyler Road Extension
Willow Run Airport
Belleville, Michigan 48111
(734) 973-1222