**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF MICHIGAN**
**SOUTHERN DIVISION**

TERRANCE EDWARD BAR,              Case No. 21-cv-11444
       Plaintiff,

v.                               Hon. Paul D. Borman

KALITTA CHARTERS II, LLC,
       Defendant

COLLIN H. NYEHOLT (P74132)
Law Office of Casey D. Conklin
Attorney for Plaintiff
4084 Okemos road, Suite B
Okemos, MI 48864
(517) 522-2550
collin@caseydconklin.com

## PLAINTIFF'S RESPONSE in OPPOSITION to DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

## **TABLE OF CONTENTS**

Issues Presented................................................................................................iii

Most Relevant Authority...................................................................................iv

Facts.................................................................................................................1

Argument ........................................................................................................ 13

    I.     The Standard of Review Favors Mr. Bar.......................................... 13

    II.   There is Sufficient Evidence to Support Mr. Bar's Title VII Retaliation
        Claim........................................................................................... 14

Conclusion...................................................................................................... 24

Certificate of Service...................................................................................... 24

## ISSUES PRESENTED

Whether the only "adverse action" the Court may consider in support of Plaintiff's Title VII Retaliation claim is his termination.

    Defendant Answers: Yes

    Plaintiff Answers: No


Whether Plaintiff may, in light of the Sixth Circuit's ruling on appeal, *also* rely upon "(1) requiring [Bar] to report to a duty station four hours away from his house, when his previous one was only forty-four minutes away; (2) causing him to sleep on a reclining chair in the crew room at the airport between shifts instead of paying for a hotel room, as it did for some pilots; (3) scheduling him to fly when no aircraft or co-pilot was available" as *additional* adverse actions in support of his Title VII Retaliation Claim**?**

    Plaintiff Answers: Yes.

    Defendant does not address the Sixth Circuit's ruling in its argument.


Whether there is a question of fact as to whether Darrel Coleman, the person who made the decision to terminate Bar, knew about Bar's complaint about DeBourge's exposing him to homosexual pornography before he made the termination decision?

    Plaintiff Answers: Yes.

    Defendant's Answer unknown


Whether, ignoring Coleman's personal knowledge, Gaedtke and DeBourge's retaliatory animus may be imputed to the termination decision which they influenced in light of the doctrine the Sixth Circuit enunciated in *Mys v. MI Dep't of State Police*?

    Plaintiff Answers: Yes.

    Defendant's Answer unknown.

### <u>Most Relevant Authority</u>

**6th Circuit's Order on Appeal, ECF 28, PageID 193-206** - Ruling, *inter alia,* that "the acts alleged" by Plaintiff including "(1) requiring [Bar] to report to a duty station four hours away from his house, when his previous one was only forty-four minutes away; (2) causing him to sleep on a reclining chair in the crew room at the airport between shifts instead of paying for a hotel room, as it did for some pilots; (3) scheduling him to fly when no aircraft or co-pilot was available" amounted to adverse actions under the applicable standard from *Burlington Northern* because they "were sufficiently severe that they 'might have dissuaded a reasonable worker from making or supporting a charge of discrimination.'" This ruling is now the law of the case and applies to all further proceedings under the mandate rule. *See Scott v. Churchill*, 377 F.3d 565, 569-70 (6th Cir. 2004).

*Burlington Industries v. Ellerth*, 524 US 742 (1998) – holding that, in a Title VII Retaliation claim, an action by the employer is "materially adverse" if it "might have dissuaded a reasonable worker from making or supporting a charge of discrimination."

*Mys v. Mich. Dep't of State Police*, 886 F.3d 591, 600 (6th Cir. 2018) – holding that "if a supervisor performs an act motivated by [retaliatory] animus that is *intended* by the supervisor to cause an adverse employment action, and if that act is a proximate cause of the ultimate employment action, then the employer is liable under [Title VII]."

## FACTS

Terry Bar began taking flying lessons at the age of fourteen.[1] Through a chance encounter, he learned that Defendant Kalitta Charters was hiring.[2] The opportunity was exciting, because Kalitta offered opportunities to train and gain experience on different aircraft.[3] Plaintiff was particularly interested in the position, because Kalitta offered ad-hoc DC-9 routes out of Ypsilanti, Michigan, which was near his home.[4] Mr. Bar applied and, fairly quickly, was hired by Darrell Coleman and approved to train to fly DC-9 aircraft for the company.[5]

In February of 2020, Plaintiff attended a required training by Kalitta.[6] In a group meeting Kalitta's Check Airman Greg Debourge performed simulated fellatio.[7] Plaintiff was disturbed by this, because "we had two ladies present in the meeting."[8] Later in the flight simulator, DeBourge interrupted the training and said to Plaintiff and his simulator partner "hey guys, look at this!" and then proceeded to show them his cellular phone.[9] Plaintiff saw that Mr. DeBourge had pulled up a homosexual pornographic video depicting "30 guys in a circle, and they were all

---

[1] Bar Dep., ECF 43-3 at PageID 329-330.
[2] *Id.* at PageID 334.
[3] *Id.*
[4] *Id.* at PageID 335.
[5] *Id.* at PageID 334.
[6] *Id.* at PageID 367.
[7] *Id.* at PageID 368.
[8] *Id.* PageID 366:24-367:1.
[9] *Id.* at PageID 370.

having sex with each other."[10] Mr. Bar described this as the "most disgusting thing I have ever seen in my life"[11] and testified "I almost threw up."[12]

Plaintiff immediately left the simulator, and started making some calls about what had occurred.[13] First, he called Darrell Coleman[14] who did not answer and so Plaintiff left him a message asking for a call back.[15] Plaintiff then called Mike Gaedtke, the Chief Pilot.[16] Gaedtke acknowledges that Mr. Bar reported DeBourge for showing him homosexual pornography on his phone, and requested that Gaedtke it stop.[17]

In an apparent attempt to conceal the incident, Mr. DeBourge proceeded to falsify an FAA form for the training, by indicating that Bar had completed four hours of training despite the fact he had only completed two.[18]

According to Mr. Gaedtke, he "found Mr. DeBourge's behavior to be inappropriate and addressed the incident with him directly while at the simulator"

---

[10] *Id*. at PageID 372.
[11] *Id*. at PageID 370:1-13.
[12] *Id*.
[13] *Id*. at PageID 370.
[14] *Id*. at PageID 370.
[15] *Id*.  PageID 371.
[16] *Id*. at PageID 369; *Id*. at 370-72; *Id*. at PageID 375-376.
[17] *Id*. at PageID 514:19-515:7; Gaedtke Aff, ECF 43-10 at ¶ 7.
[18] **Ex F −** Simulator Records.

and he "admonished Mr. DeBourge for his lack of professionalism and directed him not to engage in such behavior."[19]

Shortly after the February 2020 incident with DeBourge, Plaintiff observed that Kalitta's Human Resources made everyone go through a sensitivity and sexual harassment training.[20] He also found himself to be the target of animosity after the incident because "there's a clique in that company. I ruffled some feathers. And I believe since I blew the whistle on Greg, that I was now a marked man."[21] The next time Bar saw Gaedtke in person after the DeBourge incident, Plaintiff observed that he had gone from being "buddy-buddy" towards him to being "standoffish" and seemingly "avoiding" him.[22]

Plaintiff's place of reporting was changed from the Willow Run Airport, about 40 minutes' from his home, to Cincinnati / Northern Kentucky International Airport, about 4 hours' drive from his home.[23] Around this point in time, Kalitta had begun the process of phasing out its DC-9 planes in favor of the more advanced 737s.[24] Kalitta attempts to vaguely argue that its transition from DC-9s to 737s out of Ypsilanti justified this transfer of Plaintiff. According to Bar "it was my understanding they were just replacing the aircraft. And I would still be doing

---

[19] Gaedtke Aff, ECF 43-10 at ¶ 8.
[20] Bar, ECF 43-3 at PageID 382.
[21] *Id*. at PageID 508:13-15.
[22] *Id*. at PageID 511.
[23] *Id*. at PageID 383.
[24] *Id*. at PageID 385-387; *Id*. at 390:1-7; **Ex I –** Kalitta post re DC-9 retirement

ad hoc out of Ypsilanti. ...But, they kept on bringing me back to Cincinnati."[25] Had Kalitta *told* Bar they were moving him permanently to Cincinnati, he would have quit.

Kalitta also started, at this point, harassing Mr. Bar through his scheduling by calling him to work, only to announce there was no plane for him. For instance, on one occasion in April of 2020 Mr. Bar was made to drive to Cincinnati on *Easter Weekend* only to learn that there was no plane for him to fly.[26] Mr. Bar had been scheduled to fly with a captain named Glenn Ingle[27], referred to sometimes by his nickname "Gunner," out of Cincinnati.[28] After Bar made the four-hour trek to Cincinnati, he learned that Ingle was flying *ad hoc* out of *Ypsilanti*. Bar could, and *should,* have been assigned as his co-pilot. Instead, he was sent to Cincinnati. This had him away from his family for the entire holiday, for no reason. Bar testified that similar incidents occurred when he was scheduled to fly out of Cincinnati *3 or 4 different times.*[29]

In similar fashion, in May of 2020 Plaintiff was scheduled to fly out of Phoenix for an *entire week*. But, after traveling to Phoenix, he only flew twice.[30] When he called and spoke to Kalitta's dispatch, he was told only "something

---

[25] Bar, ECF 43-3 at PageID 384:1-8.
[26] *Id*. at PageID 342-343; *See also* **Ex C –** Schedule.
[27] Bar, ECF 43-3 at PageID 384:15-16 ("Gunner's name is Glen Ingle.")
[28] *Id*. at PageID 344.
[29] *Id*. at PageID 410.
[30] *Id*. at PageID 432; **Ex D –** Emails re Phoenix Assignment

happened. Stay at the hotel."[31] After he complained about the other three times he was incorrectly scheduled, Kalitta finally sent him an email regarding standby status.[32]

The mishandling of his scheduling affected his licensing efforts. Pilots' promotions and certifications are based in large part upon hours logged in the air. According to Bar, "I had to get 100 hours for consolidation they call it, 100 hours. So the faster you get your 100 hours, the better."[33] "I'm trying to bank my hours as fast as I can."[34] "[A]s soon as the 100 hours is over, I'm going back to [Ypsilanti]. I'm not staying in Cincinnati."[35] He was not able to do that sitting in a hot hotel room in Phoenix for a week, or being sent to Cincinnati only to learn the captain he was *supposed* to fly with was back in Ypsilanti![36] By continually mishandling his scheduling, Defendants were not only able to hassle him by keeping him far away from his home, they were also able to delay him in acquiring certifications necessary for advancement.

During this period of time, Kalitta started providing hotel rooms to its pilots, rather than make them sleep in crew quarters, due to the pandemic. This was never

---

[31] Bar, ECF 43-3 at PageID 433.
[32] *Id.*
[33] *Id.* at PageID 390:11-16.
[34] *Id.* at PageID 390:22-23.
[35] *Id.* at PageID 390.
[36] *Id.* at PageID 390-91.

communicated to Mr. Bar. He found out when another pilot happened to mention he was "on his way to the hotel."[37]

On June 5, 2020 there was a veer of incident at Rochester Airport.[38] Mr. Bar was the First Officer and another individual, Buchanan, was the Captain. Bar testified, unequivocally, that ultimately the cause of the incident was an equipment problem with the engine.[39] During takeoff the left engine did not power up correctly, causing loss of control of the plane and resulting in its veering off the runway.[40] Buchanan's performance compounded the problem. As First Officer, "if anything happens, it's [Captain Buchanan's] job to abort the takeoff. I can't even call abort."[41] Buchanan failed to take appropriate action when the failure occurred, compounding the problem.[42] Kalitta has nevertheless blamed Plaintiff for the incident, claiming that he engaged the TO/GA button prematurely, and before the engines had powered up to 40%.[43] But, Plaintiff specifically testified that, no, both engines were at the required 40% when he pushed the button; the problem was that "the right engine accelerate far, far way ahead of the other engine and got the

---

[37] *Id.* at PageID 402-403.
[38] *Id.* at PageID 348; *Id.* at 437-440
[39] *Id.* at 440:19-23; *Id.* at 441:15-20.
[40] *Id.* at 437-440.
[41] *Id.* at 442:20-22
[42] *Id.*
[43] *Id.* at 443:21-23; Coleman Aff, ECF 43-4 at ¶ 16, "Kalitta determined that the veer off was caused by Bar's lack of understanding with respect to 737 automation. Specifically, Mr. Bar engaged the aircraft's autothrottle before the two wing-mounted engines spooled up evenly."

asymmetrical."[44] "I did everything by the book."[45] And, when he and Buchanan were interviewed by the FAA immediately after the incident, they *both* stated that Plaintiff engaged TO/GA *after* the engines had reached 40%.[46] Another pilot claimed to have had a similar incident with this plane when he flew it earlier.[47] For a company that took this veer off "very seriously," Kalitta also failed and refused to pull the cockpit voice recordings or the flight data from the takeoff.[48]

After the incident in Rochester, Plaintiff flew back to Cincinnati to retrieve his car.[49] He ran into Mike Gaedtke and tried to explain to him what had happened with the engine failure, but when he spoke to him "it didn't appear like he wanted to hear what I was saying."[50]

According to Darrell Coleman, Kalitta's Director of Training, Plaintiff and Buchanan were both assigned to remedial training after the incident.[51] As part of this training, Plaintiff underwent multiple "proficiency checks" with three different "check airmen," who are pilots designated by the FAA to ensure pilots "meet both the FAA's regulatory requirements and company standards."[52] Coleman "assigned

---

[44] Bar, ECF 43-3 at 445.
[45] *Id.* at 449:9.
[46] **Ex G** – Excerpt from FOIA'd FAA record re Incident
[47] **Ex M –** Aviation Herald Article, comment by Mark Newton.
[48] Bar, ECF 43-3 at 443:14-20; *Id.* at 444:3-6.
[49] *Id.* at 447:14-20.
[50] *Id.*
[51] *Id.* at PageID 349; Coleman Aff, ECF 43-4 at ¶ 18.
[52] *Id.* at ¶¶ 9-10.

three different check airmen to fly with Mr. Bar so I could gather a consensus about his performance."[53] The three check airmen he chose were Robert Ingle, Robert Numbers, and *Greg DeBourge, the harasser*.[54] According to Coleman, after the different Check Airmen had worked with Bar, "[o]n August 5, 2020, I sent an email to all of the Check Airmen who flew with Mr. Bar to get an update on his progress."[55] That email between the Check Airmen is on the record.

> **Coleman:** I need a status update on him [Bar] as I am ready to move past his requalification efforts.
>
> **Ingle:** The flying I did with Terry Bar was up to standard but he did struggle with FMS. He would recognize his faults and could adapt. Things like Being in V nav path in a complicated descent that would not work out and then changing to level change or Verticl speed to recover. *The FMS takes years to master But if a person recognizes when it's not going to work and can use the mode control panel to intervene this is Acceptable and common for people with low FMS experience.*[56]
>
> **Numbers:** I flew the first 4:39 hrs of his requal. *His PF skills (3 legs) were up to standards.* He made several mistakes in the FM but *was re-trained to standards.*[57]

---

[53] *Id.* at ¶ 26.

[54] Bar, ECF 43-3 at PageID 351-52.

[55] Coleman Aff, ECF 43-4 at ¶ 27.

[56] **Exhibit A.** Note: the FMS is an automated system used to fly larger planes. It is typically taught through on-the-job experience. Ingle's comments call into question Defendant's various statements that Plaintiff's unfamiliarity with the FMS justified termination; he was learning like he was supposed to at this point.

[57] **Note:** Mr. Coleman claims that, with respect to his inquiry to the check airmen involved, th ta "none of them signed off on Mr. Bar's OE as satisfactory." (Coleman Aff, ECF 43-4 at ¶ 27.) Mr. Numbers' statement that Bar's skills "were up to standards" and that he "was re-trained to standards" on the areas he initially found deficient directly contradicts his averment.

**DeBourge:** I flew 4 days with him last week. I literally had to watch him the entire time. On one takeoff into low IMC he overbanked. A couple times he exceeded 250 knots descending through 10,000. A couple of times he asked for flap settings at airspeeds that were above the placard speed. In the beginning of the week he was making up arbitrary numbers as reduced power settings without consulting the runway analysis charts. He never was able to know if the plane was on profile. His descent planning ability, not there. I had to comment several times he was low or high. On a night visual into CID he turned onto final with 4 red on the PAPI. On that one IMC approach at 500' agl he took both hands off the yoke and throttle to take a drink of water. Friday I wasn't confident that Terry cold manage to get the airplane safely on the ground if the Captain had become incapacitated so I didn't sign him off. *If you decide to keep him he will need to fly with only the best captains.* [58]

To recap, Ingle and Numbers both indicated that Bar was up to standards. The only one who felt otherwise was DeBourge, the *harasser*. Coleman then brought Michael Gaedtke, Carl Barnes, and Leslie Brown into the conversation by forwarded Numbers and DeBourge's (but not Ingle's) comments in the email chain above to them.

**Coleman:** We need to make a decision about this ASAP! We have invested a ton of time and resources into this project.

**Barnes:** Doesn't sound like he's making the grade to me.[59]

Plaintiff contests the factual accuracy of Numbers and DeBourge's negative reports of his performance during the training. Plaintiff testified that when he flew

---

[58] **Ex A –** August 5, 2020 email chain
[59] *Id.*

with Mr. DeBourge, he made positive comments about his flying.[60]   And, Plaintiff testified that several negative comments Mr. Numbers made on the instructor comment form were inaccurate and untruthful.[61]  For instance, Numbers claimed that in the leg from ROC to CVG Plaintiff "oversh[o]t final turn on runway 9."[62] This statement can be disproven by public records. There is an online, publicly available database called "Flightaware." It logs information on commercial flights and makes it available to the public. This includes tracking information for the plane's flight path. If a pilot overshoots a runway, this will show on the flight path. One can actually *see* a question mark shaped trail in the path before the plane squares off to the runway.[63]  The Court may take judicial notice that the Flight Aware data for the flight in question shows that Bar did *not* overshoot the runway.[64]  Numbers also commented several times that Bar had erred in a fix on "KEDZE." There is no "Kedze."[65]  Numbers' instructor form contained several misstatements similar to this.[66]

---

[60] Bar, ECF 43-3 at PageID 468
[61] *Id.* at PageID 465; **Ex E –** Rob Numbers comment form.
[62] *Id.*
[63] *See:* **Ex. K –** hypothetical Flightaware report, with a runway overshoot and correction.
[64] **Ex. J –** Flighaware data from leg in question
[65] **Ex. N –** public records re "Kedzie" airport
[66] **Ex L –** Annotated Instructor Comment form, containing Plaintiff's objections thereto

Apart from his email stating that his performance was acceptable, Kalitta has never produced Glenn Ingle's training records of his experiences with Plaintiff.

Kalitta has averred that the reason for Plaintiff's termination was his supposedly "not meeting [its] standard of job performance in the 737 aircraft despite extensive remedial training" and has stated that Doug Kalitta, its President, Mike Gaedtke, its Chief Pilot, Darrell Coleman, its Director of Training, and Carl Barnes, and its Director of Operations Carl Barnes "discussed the results of [Bar's] remedial training and determined [he] was not meeting [its] standard of job performance[.]"[67] Gaedtke and Coleman, however, both claim that Coleman is the one who ultimately made the decision to fire.[68] According to Coleman, "based on the reports I received from all of the Check Airmen who evaluated Mr. Bar" Numbers, Ingle, and Debourge "I determined that Plaintiff was not adequately progressing" and "[a]s a result, I made the decision to terminate Plaintiff."[69]

Coleman claims to have terminated Bar based on his performance during retraining. But, the "reports he received" from Ingle and Numbers were both *positive*. The only *negative* report he received was from *DeBourge, the harasser*.

---

[67] **Ex B –** Defendants' Response to Plaintiff's First Discovery, (Resp. to Interrogatories 1 and 2).

[68] Coleman Aff, ECF ¶ 29, "[w]hile multiple individuals provided input into Mr. Bar's performance, as Director of Training it is ultimately my decision whether to terminate Mr. Bar"; Gaedtke Aff, ECF 43-10 at ¶ 17, "I did not make the decision to fire Mr. Bar. The decision on whether to terminate training and Mr. Bar rested with the Director of Training, Darrell Coleman."

[69] *Id.* at ¶ 28.

And, Kalitta cannot now back away from its averment in this litigation that Gaedtke was involved in the discussion of Bar's performance in the retraining that, eventually, resulted in his termination.

Meanwhile, Captain Buchanan, the other pilot involved in the veer off, was demoted to Plaintiff's same rank of First Officer and then returned to flight status.[70] Training Director Coleman attempts to justify the disparity in treatment by saying "Buchanan was a much more experienced pilot and Kalitta had confidence he could continue flying as a First Officer. Kalitta did not have the same confidence in Mr. Bar due to his performance during remedial training."[71] Buchanan botched the abort and shutdown procedures during the Rochester incident and this significantly compounded the problems. And, the only negative report that Coleman received of Bar's performance during the training was from Greg DeBourge, the harasser. Further, Plaintiff would like to state to the court that he just has upgraded to Captain on the DC9 with his current cargo airline company and also flies as a FO on their Boeing 737 charter operations carrying passengers. A jury simply would never accept this explanation.

---

[70] *Id.* at ¶ 31.
[71] *Id.* at ¶ 31.

**ARGUMENT**

**I. The Standard of Review Favors Mr. Bar.**

It is well established that, at the summary judgment stage, the evidence "must be viewed in the light most favorable to the opposing party"[72] and "[t]he evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor."[73] "[T]he judge's function is not himself to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial"[74] because, as the Sixth Circuit has observed, "[c]redibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge on summary judgment."[75] It is well settled in our Circuit that on summary judgment the Plaintiff's testimony, even if uncorroborated and even if *contradicted*, must be accepted as true.[76] It is equally well settled that the Plaintiff's own, uncorroborated

---

[72] *Adickes v. S.H. Kress Co.*, 398 US 144, 157 (1970). *See also Soper ex Rel. Soper v. Hoben*, 195 F.3d 845, 850 (6th Cir. 1999).

[73] *Morales v. American Honda Motor Co., Inc.*, 71 F.3d 531, 535 (6th Cir. 1995) *citing Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 255 (1986).

[74] *Strickland v. City of Casey*, No. 19-2373, at *6 (6th Cir. Apr. 22, 2021) (rec'd for publication) (citations omitted).

[75] *Id*. at *21

[76] *Harris v. J.B. Robinson Jewelers*, 627 F.3d 235 (6th Cir.2010); *Moran v. Al Basit LLC,* 788 F.3d 201, 203 (6th Cir. 2015); *Strickland, supra.*

testimony is itself sufficient to make out a question of fact sufficient to avoid summary judgment.[77]

## II. There is Sufficient Evidence to Support Mr. Bar's Title VII Retaliation Claim.

Plaintiff's Title VII retaliation claim should be evaluated under the *McDonnell Douglas* burden shifting analysis.[78] He must show that (1) he engaged in protected activity, (2) the defendants knew about it, (3) the defendants took 'materially adverse' actions thereafter, and (4) there was a causal connection.[79] If he can, the burden then "shifts" to the defendant to provide a nondiscriminatory reason for the adverse action.[80] If they can, the burden "shifts" back to the MR. Bar to show that the proffered reason was a pretext for discrimination, such as by showing the stated reason was false, or insufficient to justify termination.[81]

Mr. Bar engaged in protected activity when he complained to Mike Gaedtke about Greg DeBourge's exposing him to homosexual pornography because, as the Sixth Circuit noted, "Title VII's 'opposition clause' protects 'complaints to

---

[77] *Harris, supra; Moran, supra; Strickland, supra.*

[78] *See A.C. v. Shelby Cty. Bd. Educ.*, 711 F.3d 687, 697 (6th Cir. 2013)

[79] *Mys v. Mich. Dep't of State Police*, 886 F.3d 591, 599-600 (6th Cir. 2018).

[80] *Penny v. United Parcel Serv.*, 128 F.3d 408, 417 (6th Cir. 1997).

[81] *Id.*

management and less formal protests of discriminatory employment actions."[82] The first element is satisfied. The Defense does not argue to the contrary.

Mike Gaedtke knew about Plaintiff's complaint.[83] Gaedtke "admonished Mr. DeBourge for his lack of professionalism"[84] so Mr. DeBourge, therefore, was also aware of Plaintiff's complaint. Coleman claims that he was not aware of the complaint until after the termination but Mr. Bar testified that he called and left Darrell Coleman a message immediately after the incident.[85] It strains credulity that he would not have inquired of Gaedtke what transpired therafter. On summary judgment, the Court should resolve the factual dispute as to whether Coleman was aware of the complaint prior to the termination in Bar's favor. Even so, Gaedtke and DeBourge *influenced* the termination decision by both providing negative assessments of Bar's performance during retraining. As shall be discussed, this fact is sufficient to imputer their retaliatory animus to same. The second element goes to Plaintiff.

Defendants argue that the "material adverse" action in the case is limited to the ultimate termination. This is incorrect. As will be discussed to follow, the Sixth Circuit ruled that other the *other* actions Kalitta took towards him may satisfy this

---

[82] ECF 28, Sixth Circuit Order at 10 of 12, *citing EEOC v. New Breed Logistics*, 783 F.3d 1057, 1067 (6th Cir. 2015).
[83] Gaedtke Aff, ECF 43-10 at ¶ 8.
[84] *Id*. at ¶ 8.
[85] Bar, ECF 43-3 at PageID 370.

element as well. Even so, Bar was ultimately fired which, without question, is a "materially adverse" action. Ignoring this, he was ultimately terminated which, without question, is a materially adverse action. The third element goes to Plaintiff.

As to the causal connection, Mr. Bar is able to demonstrate a continuing arc of retaliation that started shortly after his Complaint, when Kalitta transferred him to Cincinnati and started altering his schedule, and culminated in Kalitta's termination based on demonstrably factually inaccurate statements by Numbers and DeBourge. As the Sixth Circuit ruled, "[t]hese allegations provide 'sufficient factual content' from which this court, informed by our 'judicial experience and common sense, could draw the reasonable inference' that Kalitta retaliated against Bar for complaining about DeBourge's conduct."[86] The fourth element goes to Plaintiff.

Since Plaintiff has made out his prima facie case, the burden "shifts" to Kalitta to demonstrate a nondiscriminatory reason for the termination. They state that it was because "Plaintiff was not adequately progressing" "based on the reports [Coleman] received from all of the Check Airmen who evaluated Mr. Bar."[87] There is significant evidence upon which a jury could reject this contention.

First and foremost, Kalitta's decision to put Plaintiff *into* remedial training was *itself* based on demonstrable pretext. The plane went off of the runway

---

[86] Order on Appeal, ECF 28, Page 12 of 13.
[87] Coleman Aff, ECF 43-4 at ¶ 28.

because of an equipment failure, not any error on Bar's part. Both he and Buchanan told the FAA at the time that Plaintiff did everything he was supposed to do, waiting until the engines were properly powered up before engaging TO/GA. Kalitta claims' the opposite, of course. But, Kalitta's failure to review the "black boxes" which are the flight data recording and the voice cockpit recordings to determine the *real* cause of the aircraft veering off the runway is telling.

Further, Plaintiff can demonstrate that the negative statements the Check Airmen during the training were pretextual. Plaintiff has claimed right through that the instructor comment form created by Check Airman Numbers contained factual inaccuracies. Even so, the email chain Defendants refer to contains statements by Numbers that *"[h]is PF skills (3 legs) were up to standards"* and, with respect to mistakes he observed, *"he was re-trained to standards"*[88] which suggests that, true or not, the negative statements in Numbers' instructor comment form did not justify termination. Numbers himself said he was "up to standards" and "re-trained to standards." The only Check Airman who provided negative statements about Plaintiff in response to Coleman's inquiry was Greg DeBourge, the harasser.

Plaintiff has identified facts and evidence that a jury could conclude proves that Kalitta's stated reason for his termination was a pretext. His retaliation claim therefore should survive summary judgment.

---

[88] **Ex A –** August 5, 2020 email chain

### a. The Sixth Circuit ruled that the "adverse actions" in this case are *not* limited to the termination decision and this holding is now the law of the case and the mandate rule requires application of this holding to future proceedings.

The Defense argues that "the only 'materially adverse' action was Plaintiff's termination." The Sixth Circuit rejected this argument and ruled to the contrary during the earlier appeal. The Defense's continuing to advance this argument therefore violates the law of the case doctrine and the mandate rule.

On October 25, 2021, this Court ruled that "being required to drive to a different airport, to sleep in a crew room, and the lack of available aircraft are not materially adverse actions."[89] Plaintiff appealed on this point, arguing that this Honorable Court had erred by failing to apply the correct standard for adverse employment action found in *Burlington Industries v. Ellerth*, 524 US 742 (1998).[90] Plaintiff blushes to remind the Court that the Sixth Circuit agreed with Plaintiff and reversed this Court "because the district court applied the wrong framework"[91] to the "materially adverse" requirement. The Sixth Circuit agreed with Plaintiff that the standard from *Burlington Northern* should apply. An action by the employer is "materially adverse" if it "might have dissuaded a reasonable worker from making or supporting a charge of discrimination."[92] Applying the *Burlington* standard to

---

[89] Op. and Order, ECF 23, PageID 182
[90] **Ex. H – Statement of Parties and Issues** at ¶¶ 8 and 9.
[91] Sixth Circuit Order, ECF 28, p., 10 of 13.
[92] *Id.* at p. 12 of 13.

our case, the Sixth Circuit ruled that "the acts alleged" including "(1) requiring [Bar] to report to a duty station four hours away from his house, when his previous one was only forty-four minutes away; (2) causing him to sleep on a reclining chair in the crew room at the airport between shifts instead of paying for a hotel room, as it did for some pilots; (3) scheduling him to fly when no aircraft or co-pilot was available" "were sufficiently severe that they 'might have dissuaded a reasonable worker from making or supporting a charge of discrimination'"[93] and therefore would count as adverse actions under the *Burlington* standard.

The Sixth Circuit's ruling forecloses Defendants' continued argument to the contrary because

> [t]he law-of-the-case doctrine posits that when a court decides upon a rule of law, that decision should continue to govern the same issues in subsequent stages in the same case. However, the doctrine merely directs a court's discretion; it does not limit the tribunal's power. In essence, the mandate rule is a specific application of the law-of-the-case doctrine. The basic tenet of the mandate rule is that a district court is bound to the scope of the remand issued by the court of appeals. The scope of a remand is determined by examining the entire order or opinion, to determine whether and how the court of appeals intended to limit a remand.[94]

Without question, the Sixth Circuit intended that the Court should apply the *Burlington* standard of "adverse action" and that the other "acts alleged" by Plaintiff should be viewed as materially adverse for purposes of this claim.

---

[93] *Id.*
[94] *Scott v. Churchill*, 377 F.3d 565, 569-70 (6th Cir. 2004) (internal citations omitted)

Applying the law of the case doctrine, and the mandate rule, the Sixth Circuit's holding in this respect governs.

The Court of Appeals' ruling accords with existing precedent in our circuit. The Sixth Circuit has noted that the "less onerous"[95] definition of "adverse action" applies to heightened scrutiny by management.[96] In *Laster v. City of Kalamazoo*[97] the Sixth Circuit concluded that "facing heightened scrutiny, receiving frequent reprimands for breaking selectively enforced policies, being disciplined more harshly than similarly situated peers, and forced to attend a pre-determination hearing based on unfounded allegations[.]"[98] And, the Sixth Circuit has held that a reassignment, even *without* a change in salary, benefits, title, or work hours *may* constitute an adverse action in a Title VII *retaliation* claim.[99] Bar's transfer, his iniquitous sleeping conditions, and the unjust scheduling all count.

---

[95] *Michael,* 496 F.3d at 594-96 (internal quotation marks omitted).

[96] *Laster v. City of Kalamazoo*, 746 F.3d 714 (6th Cir. 2014)

[97] 746 F.3d 714 (6th Cir. 2014).

[98] *Id*. at 732.

[99] *See, eg Mys v. MI Dep't of State Police,* 886 F.3d 591 (6th Cir. 2018) (MI State Police Sergeant's transfer to remote, less favorable post, without change in benefits, title, and work hours, with slight increase in salary, amounted to an adverse action in a Title VII *retaliation* claim, applying the *Burlington* standard); *see also Deleon v. City of Kalamazoo*, 739 F.3d 914, 918-19 (6th Cir. 2014) (finding that an employee's involuntary transfer to a position, for which he had actually applied in the past, could nonetheless be viewed "materially adverse" action in light of the circumstances surrounding the assignment).

**b. Kalitta allowed both the harasser and the manager to whom Bar reported to personally influenced the termination decision. By the _Mys_ doctrine, their retaliatory animus is imputed to it, whether or not the ultimate decision maker knew.**

The Defense argues that "Plaintiff's exercise of his protected right was not known to the relevant decision makers who allegedly retaliated against him."[100] See, because *Coleman* ultimately made the decision to fire Plaintiff, and *Coleman* claims he "did not know" about Plaintiff's complaint, Kalitta claims it could not have been motivated by retaliation.

First and foremost, this is factually inaccurate. Plaintiff testified that the first call he made after DeBourge showed him the pornography was to Darrell Coleman.[101] Coleman denies knowledge of the incident until after the termination. However, it strains credulity that he would not have inquired what occurred at that point. On summary judgment, Bar's account prevails so we have to assume he knew about the complaint when he fired Bar.

Second, Greg Debourge, *the harasser himself*, and Mike Gaedtke, the person who received Bar's complaint and *disciplined* DeBourge, were both allowed to influence the termination decision. DeBourge was one of the three Check Airmen whose evaluation Gaedtke considered. And, on this record, DeBourge was the only

---

[100] Def's Brief, ECF 43, PageID 298.
[101] Bar, ECF 43-3, PageID 371.

one who did not indicate Bar was re-trained and performing to standard. Gaedtke knew this; Coleman forwarded DeBourge's email to him and he permitted the termination to proceed nonetheless.[102] Gaedtke nevertheless allowed it to happen. Even if Coleman did *not* know about the Complaint, can Kalitta avoid liability for the obvious retaliatory animus that DeBourge and Gaedtke brought to the termination decision? Sixth Circuit caselaw tells us that the answer is a resounding "no."

The situation is very similar to *Mys v. MI Dep't of State Police*[103]. Linda Mys was a Sergeant in the Michigan State Police. She reported another officer in her post for sexually harassing her. Gary Gostky, the Captain of Mys' District, decided the charge and he found her allegations to be without merit. Gorsky then ordered Mys removed from her home post on the Western side of Michigan on an "emergency" basis because she kept making sexual harassment claims which, he felt, had created a hostile working environment for the harasser. MSP's procedures are such that in order for an emergency transfer to become *permanent*, a five-member Transfer Review Board is convened. The TRB ultimately decided to send Mys to Detroit, which is a three hour drive from her home and generally viewed as an undesirable assignment. Mys sued, claiming the transfer to this undesirable location violated Title VII's anti-retaliation provision. The State Police argued,

---

[102] **Ex A** – email chain
[103] 886 F.3d 591 (6th Cir. 2018)

much as the Defendants do here, that because the *TRB members themselves* were ignorant of Mys' sexual harassment complaint, the transfer could not have been retaliatory. The Sixth Circuit rejected this argument, holding that "**if a supervisor performs an act motivated by [retaliatory] animus that is *intended* by the supervisor to cause an adverse employment action, and if that act is a proximate cause of the ultimate employment action, then the employer is liable under [Title VII]**" *Mys v. Mich. Dep't of State Police.*[104] Sergeant Mys *won* the case, because the Sixth Circuit found that Gorski's *influence* in the TRB's decision was sufficient to imputer his retaliatory animus to the transfer decision, even though the TRB members *themselves* may not have been aware of her complaints.

Bar's is another instance where the *Mys* doctrine would apply. Without question, DeBourge and Gaedtke influenced the termination decision. DeBourge, in fact, was the only check airmen of the three who found Bar unsuited. Numbers made negative statements, but he ultimately concluded that he was "trained" or "re-trained to standard." Coleman included Gaedtke in this email chain, so Gaedtke *knew* that Bar was facing termination based on DeBourge's negative statements. Applying *Mys,* the retaliatory animus of these individuals may, and should, be imputed to the termination decision. Kalitta, the employer, is liable.

---

[104]  886 F.3d 591, 600 (6th Cir. 2018)

## CONCLUSION

For the reasons stated herein Plaintiff prays this Honorable Court DENY Defendants' Motion in its entirety.

Respectfully Submitted,

Dated:   5 / 24  / 2023                  */s/ Collin H. Nyeholt*

Collin H. Nyeholt (P74132)
Law Offices of Casey D. Conklin, PLC
Attorney for the Plaintiff
4084 Okemos Rd, Ste. B
Okemos, MI 48864
(517) 522-2550
collin@caseydconklin.com

## Certificate of Service

I, the undersigned, do hereby affirm that on or before today's date, the attached document, and all exhibits thereto, were served upon opposing counsel as captioned above via the ECF system.

Dated:  5  /  24  / 2023                 */s/ Collin H. Nyeholt*

Collin H. Nyeholt (P74132)