UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

TERRANCE E. BAR,

                Plaintiff,                    Case No. 21-cv-11444

v.                                    Paul D. Borman
                                    United States District Judge

KALITTA CHARTERS II, LLC,

                Defendant.

_____/

## OPINION AND ORDER GRANTING DEFENDANT KALITTA CHARTERS II, LLC'S MOTION FOR SUMMARY JUDGMENT (ECF NO. 43)

This is an employment discrimination case arising out of Plaintiff Terrance E. Bar's termination from his employment as a pilot with Defendant Kalitta Charters II, LLC (Kalitta). Plaintiff now asserts a claim of retaliation pursuant to Title VII of the Civil Rights Act of 1964 against Kalitta. Now before the Court is Defendant's Motion for Summary Judgment seeking dismissal of Plaintiff's retaliation claim. (ECF No. 43.) The motion has been fully briefed and is ready for adjudication.

The Court held a hearing on Defendant's Motion for Summary Judgment on October 20, 2023, at which counsel for both Plaintiff and Defendant appeared.

1

For the reasons that follow, the Court GRANTS Defendants' Motion for Summary Judgment and dismisses Plaintiff's Title VII retaliation claim with prejudice.

## I.  FACTUAL AND PROCEDURAL BACKGROUND

### A.    Relevant Facts

#### 1.    Plaintiff's employment with Kalitta

Defendant Kalitta Charters II, LLC (Kalitta) is an "on demand" airline charter company that transports cargo around the world. https://www.kalittacharters.com/about/   [https://perma.cc/F8SJ-MSZH].   Kalitta hired Plaintiff as a pilot for its fleet of DC-9 aircraft in March of 2018. Plaintiff flew cargo on an ad hoc basis on the DC-9 from Kalitta's home base at Willow Run Airport (YIP) in Ypsilanti, Michigan. (ECF No. 43-3, Pl. Dep. at pp. 12-13, PageID.334-35.) Ad hoc flying is conducting unscheduled, on-demand flights. (*Id.* at p. 194, PageID.516.)

In 2019, Kalitta announced that it would be retiring its entire DC-9 fleet due to new Federal Aviation Agency (FAA) rules requiring equipment that the DC-9 fleet did not have. Kalitta advised all of its DC-9 pilots, including Plaintiff, that they would be given the opportunity to train and transition to piloting Kalitta's fleet of

737 aircraft. (*Id.* at pp. 13-14, PageID.335-36) (ECF No. 43-7, Handlon Decl. ¶ 8, PageID.554.)

### 2.   Plaintiff complains about being shown a pornographic video during his 737 training

Plaintiff started his training to transition to piloting 737 aircraft in January 2020, beginning with attending ground school. (ECF No. 43-3, Pl. Dep. at p. 15, PageID.337.) In February 2020, after completing ground school, Plaintiff advanced to 737 training in a flight simulator – a machine resembling the cockpit of an aircraft, with images that mimic the pilot's view and mechanisms that imitate the aircraft's motion. (*Id.*)

Plaintiff states that on or around February 20, 2020, Greg DeBourge, a Check Airman employed by Kalitta,[1] did a disturbing sexually suggestive simulation act in a training meeting at a hotel in Miami, Florida. (*Id.* at pp. 45-46, PageID.367-68.) Plaintiff asserts that he was disturbed by this because two female co-workers were

---

[1] A Check Airman is an aircraft pilot approved by the Federal Aviation Administration (FAA) to evaluate and certify the knowledge and skills of other pilots and "who is qualified to conduct flight checks in an aircraft, in a flight simulator, or in a flight training device for a particular aircraft." 14 C.F.R. § 135.337(a)(1). (ECF No. 43-4, Coleman Decl. ¶ 10, PageID.521 (explaining that Check Airmen must meet both the FAA's regulatory requirements and company standards for aircraft operations and must be approved by the FAA and act on behalf of the FAA when evaluating pilots).)

present at the meeting. (*Id.*) Plaintiff did not report this alleged incident to anyone. (*Id.*)

The next day, on February 21, 2020, during a training session in the flight simulator, Plaintiff states that Mr. DeBourge showed Plaintiff and Plaintiff's Simulator Partner Brandon Kearns a homosexual pornographic video on his cell phone. (ECF No. 43-3, Pl. Dep. at pp. 47-48, PageID.369-70.) Plaintiff was very disturbed by the video and could not resume training. He immediately left the simulator and called Darrell Coleman, Kalitta's Director of Training, to complain, but did not reach him. (*Id.* at pp. 48-49, PageID.370-71.) Plaintiff left a voice message for Mr. Coleman to please return his call. (*Id.* at pp. 49, 53, PageID.371, 375.) Plaintiff, however, did not say anything about the video incident in the voicemail to Mr. Coleman. (*Id.*)

Plaintiff next called Kalitta's Chief Pilot Mike Gaedtke and told him over the phone that Mr. DeBourge "was showing gay videos on his phone." (*Id.* at pp. 49, 53-54, PageID.371, 375-76.) After speaking to Plaintiff on the phone, Mr. Gaedtke, who had been across the street, came to the training facility, listened to Plaintiff's complaint about Mr. DeBourge, and gave Plaintiff his car keys so that Plaintiff could go back to his hotel room for the rest of the day, which he did. (*Id.*) (ECF No. 43-10, Gaedtke Decl. ¶ 7, PageID.601.) Mr. Gaedtke found Mr. DeBourge's behavior

4

inappropriate, and he addressed the incident directly with Mr. DeBourge that day while at the simulator. (ECF No. 43-10, Gaedtke Decl. ¶ 8, PageID.601.) He admonished Mr. DeBourge for his lack of professionalism and directed him not to engage in such behavior. (*Id.*) Mr. Gaedtke "considered the matter closed" and did not make a written record of the incident or tell anyone else about Plaintiff's complaint. (*Id.* ¶¶ 9-10, PageID.601.) Mr. Gaedtke is unaware of any similar conduct by Mr. DeBourge since the incident (*id.* ¶ 9, PageID.601), and Plaintiff does not complain of any similar or otherwise offensive conduct by Mr. DeBourge since that date.

Plaintiff resumed his simulator training the following day and passed his proficiency check with Mr. DeBourge – which is an evaluation of a pilot's skills and knowledge in a specific type of aircraft, as required by the FAA – on February 23, 2020. (ECF No. 43-3, Pl. Dep. at p. 15, PageID.337.)

Plaintiff then entered the initial operating experience (OE) phase of the transition training. (*Id.*) Kalitta explains that in the OE phase, a Check Airman evaluates the pilot's ability to operate a 737 during actual flight in accordance with FAA criteria. (ECF 43-4, Coleman Decl. ¶ 12, PageID.521.) Generally, a pilot must successfully complete at least 25 hours of initial operating experience flying in an actual aircraft to be released to fly unsupervised. (*Id.* ¶¶ 12, 23, PageID.521, 524.)

5

A Check Airman signed off on Plaintiff's initial OE on March 27, 2020, and Plaintiff was then released to fly as a First Officer on the 737 without observation. (ECF No. 43-3, Pl. Dep. at pp. 16-17, PageID.338-39.) Plaintiff's first unsupervised flight as a First Officer was on April 9, 2020. (*Id.* at p. 19, PageID.341.)

### 3. Plaintiff alleges Kalitta began retaliating against him for his complaint about Check Airman DeBourge to Mr. Gaedtke

Plaintiff contends that after he started piloting Kalitta's 737 aircraft as a First Officer, Kalitta began retaliating against him for reporting the February 21, 2020, incident involving Check Airman DeBourge to Mr. Gaedtke. (ECF No. 33, SAC ¶¶ 20, 39.)

### a. Assignment to CVG

Plaintiff contends that, since the "harassment event," he has been required to report to the Cincinnati Northern Kentucky International Airport (CVG), approximately four hours from his house, instead of the Willow Run Airport (YIP), which is approximately 45 minutes from his house. (*Id.* ¶¶ 21, 40(a).) He claims that this change in airports was in retaliation for his complaint about Mr. DeBourge.

Kalitta states that after its DC-9 fleet was retired and Plaintiff transitioned to piloting 737 planes, no 737 aircraft were based at YIP for ad hoc flying, as the DC-9's had been. (ECF No. 43-7, Handlon Decl. ¶¶ 9, 22, PageID.554, 558, citing ECF

No. 43-9, 737 Flight Schedule, PageID.588-98.) Kalitta states that no former DC-9 pilots had flight schedules operating 737 aircraft based in YIP. (*Id.*) Rather, two of the main hubs from which Kalitta originated flights on behalf of DHL at that time were CVG and Phoenix Sky Harbor International Airport (PHX). (*Id.* ¶ 10, PageID.555.) Kalitta's 737 pilots flying those routes are required to report to CVG and/or PHX as their originating airport. (*Id.*) As discussed above, Kalitta's decision to retire its DC-9 fleet and transition its DC-9 pilots, including Plaintiff, to the 737 aircraft was made in 2019, well before Plaintiff's complaint about Mr. DeBourge.

### b. Crew room instead of hotel

Second, Plaintiff contends that Kalitta required him to sleep in a busy crew quarter instead of providing a hotel room for him when he was assigned to CVG. (*Id.* ¶¶ 22, 40(b).) He claims that this is another instance of retaliation for reporting his complaint about Mr. DeBourge.

Kalitta explains that, on arrival at CVG, all Kalitta pilots are required to wait while the cargo is sorted and transferred from the DHL aircraft to the Kalitta 737 aircraft (this is known as "the sort"). (ECF No. 43-7, Handlon Decl. ¶ 11, PageID.555) During the sort, all Kalitta pilots would wait in a furnished pilot lounge where they can eat, watch TV, or sleep in recliners. (*Id.*) Once the sort is complete, Kalitas' pilots fly the packages to their next destination. (*Id.*)

Plaintiff acknowledges that when he started flying 737 aircraft out of CVG, he and other Kalitta pilots would wait in the crew room during the sort. (ECF No. 43-3, Pl. Dep. at pp. 80-82, PageID.402-04.) In August 2020, Plaintiff saw two Kalitta Captains who were going to wait out the sort in a hotel room instead of the crew room, as an accommodation due to the COVID-19 pandemic. (*Id.*) After speaking with the Captains, Plaintiff called the Kalitta dispatcher, requested a hotel room, and immediately received one. (*Id.* at p. 83, PageID.405.) Plaintiff admits that he received a hotel room for the rest of his tenure at Kalitta. (*Id.*)

### c. No available Captains or flights at CVG

Third, Plaintiff alleges that when flying out of CVG, he occasionally reported to CVG only to find no aircraft or Captain was available for him, so he could not fly. He claims that these were further instances of retaliation. (ECF No. 33, SAC ¶ 23) (ECF No. 43-3, Pl. Dep. at pp. 86-87, PageID.408-09.)

Kalitta explains that it pilots do not always fly when they are scheduled for duty because, in the aviation industry, pilots sometimes cannot fly their scheduled routes due to sickness, familial obligations, weather delays, exceeding their maximum duty time, or a host of other reasons. (ECF No. 43-7, Handlon Decl. ¶ 23, PageID.558-59.) To ensure that scheduled flights still proceed, Kalitta and other aircraft operators schedule pilots as "reserves" or "spares," meaning that those pilots

8

are not assigned to a specific flight but are available at a given flight's point of origin if needed. (*Id.*) Plaintiff was often scheduled as a "spare," as were the other pilots, both Captains as well as First Officers, like Plaintiff. (*Id.*, citing ECF 43-9, 737 Flight Schedule, PageID.588-98.) Spare pilots are provided a hotel room and are still fully compensated for the flights they do not actually conduct, per company policy. (*Id.*)

### d. Availability of flights at PHX in May 2020

Fourth, Plaintiff contends that he was scheduled to fly out of Phoenix Sky Harbor International Airport (PHX) for a week in May 2020, but when he arrived, he did not fly all his scheduled days. He claimed this was an act of retaliation. (ECF No. 33, SAC, ¶ 24.)

Kalitta states that Plaintiff did not fly all his scheduled PHX flights that week in early May 2020 because Kalitta needed to allow another pilot to get flight time. (ECF No. 43-7, Handlon Decl., ¶ 16, PageID.556-57, citing ECF No. 43-8, Scheduling Emails, PageID.562-86.) Specifically, crew scheduler Rachel Brewer sent an email to Plaintiff stating: "[P]lease just sit on standby so we can let Ryan Sims fly a few days. Thank you for your understanding." (*Id.* PageID.581.) Plaintiff replied: "Ok sounds good Rachel." (*Id.* PageID.580.) Plaintiff admits that he received his full pay on those days he was not required to fly. (ECF No. 43-3, Pl. Dep. at pp. 94-95, 115, PageID.416-17, 437.) Plaintiff in fact conceded in his

deposition that he "didn't really pinpoint Phoenix as, you know, a retaliatory event," but instead as "part of the runaround." (*Id.* at pp. 114-15, PageID.436-37.)

### e. The June 5, 2020, "veer-off" incident and required retraining

Finally, Plaintiff was involved in an incident on June 5, 2020, in which the aircraft he was piloting as the First Officer veered off the runway on takeoff and into the grassy infield in Rochester, New York. (ECF No. 33, SAC, ¶¶ 25-27) (ECF No. 43-3, Pl. Dep. at pp. 115-18, PageID.437-40.) Plaintiff denies responsibility for the accident and blames instead the plane's Captain, Marcris Buchanan, as well as a maintenance issue with one of the engines. Plaintiff asserts that the cause of the incident was an equipment problem with the engine which caused the left engine not to power up correctly, causing loss of control of the plane and resulting in its veering off the runway. (*Id.* at pp. 115-19, PageID.440-41.) Plaintiff further claims that Captain Buchanan's performance compounded the problem because he failed to take appropriate action when the failure occurred. (*Id.*)

Kalitta conducted an investigation and determined that the veer-off incident was caused by Plaintiff's lack of understanding with respect to the 737's automation. (ECF No. 43-4, Coleman Decl. ¶ 16, PageID.522.) Specifically, Kalitta determined that Plaintiff, who was the pilot flying the plane at the time of the incident, engaged

10

the aircraft's autothrottle before the two wingmounted engines spooled up evenly. (*Id.*) This caused one of the aircraft's engines to produce more power than the other (asymmetric thrust), which in turn caused the aircraft to yaw (turn) in one direction and direct the aircraft off the runway. (*Id.*) Kalitta further determined that Captain Buchanan was also at fault because he failed to follow appropriate procedures once the aircraft began to yaw off the runway. (*Id.* ¶ 17, PageID.522.)

As a result of the June 5, 2020, veer-off event, both Plaintiff and Captain Buchanan were administratively disqualified from further flying per company policy and sent to remedial training. (*Id.*) Plaintiff alleges however that he was subjected to disparate remedial training compared to Captain Buchanan as an act of retaliation. (ECF No. 33, SAC ¶¶ 25-28.)

As a result of the incident, Kalitta implemented additional veer-off training into its curriculum to prevent the situation from happening again. (ECF No. 43-4, Coleman Decl. at ¶ 19, PageID.523.) Both Plaintiff and Captain Buchanan were provided this training after the incident. (*Id.*)

On June 11, 2020, Kalitta provided remedial training in a simulator with Mr. Gaedtke to both Plaintiff and Captain Buchanan, and both pilots successfully completed the training. (*Id.* at ¶ 20, PageID.523, citing Exs. C-1, C-2, at ECF Nos. 43-5, Plaintiff's Training Records, 43-6, Captain Buchanan's Training Records.)

11

On June 12, 2020, Kalitta conducted a proficiency check of both Plaintiff and Captain Buchanan in the 737 simulator, again with Mr. Gaedtke, and neither pilot was proficient enough to pass. (ECF No. 43-10, Gaedtke Decl. at ¶ 15, PageID.603.) Due to the two pilots' performance, Mr. Gaedtke decided additional remedial training was necessary for both pilots. (*Id.*)

Both Plaintiff and Captain Buchanan were assigned to and completed remedial ground school on June 22-23, 2020, and they were both then sent for another proficiency check in the 737 simulator. (ECF No. 43-4, Coleman Decl. at ¶ 20, PageID.523, citing Exs. C-1, C-2, at ECF Nos. 43-5, Plaintiff's Training Records, 43-6, Captain Buchanan's Training Records.) Captain Buchanan passed his proficiency check on July 1, 2020, and Plaintiff passed his proficiency check on July 14, 2020. (*Id.*) Check Airman DeBourge conducted the proficiency tests for both pilots. (*Id.*)

As a result of the veer-off incident and his subsequent performance during remedial training, Captain Buchanan was demoted to First Officer and returned to the line where he had to fly under the supervision of a Captain. (*Id.* ¶ 30, PageID.526.) Captain Buchanan later underwent remedial OE to regain his status as a Captain, and he passed it on September 8, 2020, after completing over 25 hours of OE. (*Id.*)

12

On July 24, 2020, Plaintiff was assigned to fly remedial OE so he could demonstrate that he was capable of returning to the line, unsupervised, as a First Officer. (*Id.* at ¶¶ 20, 23, PageID.523-24.) Plaintiff's initial performance during his remedial OE was unsatisfactory, which Kalitta asserts is grounds for termination. (*Id.* at ¶ 24, PageID.524.) Rather than terminate Plaintiff at that time, Mr. Coleman decided to allow Plaintiff to continue his remedial OE with a different Check Airman to provide him an additional opportunity to demonstrate the requisite proficiency in the aircraft. (*Id.*)

On August 5, 2020, once Plaintiff hit 23 hours of remedial OE flight time and had been evaluated by three different Check Airmen (Robert Numbers, Glenn Ingle, and Greg DeBourge), Mr. Coleman sent an email to the three Check Airmen to get an update on Plaintiff's progress. (*Id.* at ¶ 27, PageID.525.) Mr. Numbers responded:

> I flew the first 4:39 hrs of his requal.
> His PF [pilot flying] skills (3 legs) were up to standards.
> He made several mistakes in the FM C but was re-trained to standard.

(ECF No. 44-2, Emails, PageID.671-72.)

Mr. Ingle stated:

> The flying I did with Terry Bar was up to standard but he did struggle with FMS. He would Recognize his faults and could adapt. Things like Being in V nav path in a complicated descent that would not work out and then changing to level change or Vertical speed to recover.

13

> The FMS takes years to master But if a person recognizes when it's not going to work and can use the mode control panel to intervene this is Acceptable and common for people with low FMS experience.

(*Id.* PageID.673.)

Finally, Mr. DeBourge responded:

> I flew 4 days with him last week. I literally had to watch him the entire time. On one takeoff into low IMC he overbanked. A couple times he exceeded 250 knots descending through 10,000. A couple of times he asked for flap settings at airspeeds that were above the placard speed. In the beginning of the week he was making up arbitrary numbers as reduced power settings without consulting the runway analysis charts. He never was able to know if the plane was on profile. His descent planning ability, not there. I had to comment several times he was low or high. On a night visual into CID he turned onto final with 4 red on the PAPI. On that one IMC approach at 500' agl he took both hands off the yoke and throttle to take a drink of water. Friday I wasn't confident that Terry cold manage to get the airplane safely on the ground if the Captain had become incapacitated so I didn't sign him off. If you decide to keep him he will need to fly with only the best captains.

(*Id.* PageID.671.) None of the three Check Airmen signed off on Plaintiff's OE as satisfactory. (ECF No. 43-5, PageID.536-37.)

Rather than terminate him at that time, Mr. Coleman decided to allow Plaintiff to continue flying remedial OE with the first Check Airman who evaluated him (Check Airman Rob Numbers). (ECF No. 43-4, Coleman Decl. ¶ 25, PageID.524-25.) Mr. Numbers evaluated Plaintiff between August 17 and August 20, 2020, and noted that Plaintiff continued to struggle during his additional 14 hours of remedial

14

OE. Mr. Numbers did not sign off on Plaintiff's OE as satisfactory. (*Id.*) (ECF No. 43-5, Plaintiff Training Records, PageID.537-39.)

Kalitta notes that Plaintiff was paid at his normal rate during the entirety of the remedial training and that all expenses incurred during the training, including flights and lodging in Florida, meals, and time in the 737 simulator, were paid by Kalitta. (ECF No. 43-4, Coleman Decl. ¶¶ 21-22, PageID.523.)

### 4.   Kalitta terminates Plaintiff's employment

Plaintiff's employment was terminated on or about August 21, 2020. Mr. Gaedtke informed Plaintiff of his termination. (ECF No. 43-3, Pl. Dep. at pp. 147-48, PageID.469-70.) Mr. Coleman asserts that while multiple individuals provided input on Plaintiff's performance, it was his decision to terminate Plaintiff. (ECF No. 43-4, Coleman Decl. ¶¶ 28-29, PageID.525-26.) Based on the totality of the information contained in the reports Mr. Coleman received from all three Check Airmen who evaluated Plaintiff during almost 40 hours of OE, Mr. Coleman decided that, in his informed professional judgment, Plaintiff was not adequately progressing in adapting to the 737's complexities, including the automation that was not present on the DC-9 aircraft Plaintiff originally piloted. (*Id.*) Mr. Coleman states that he did not know about Plaintiff's complaint about Mr. DeBourge at the time of Plaintiff's termination and only learned of that complaint after Plaintiff sent an email to Kalitta

15

containing his allegations on November 1, 2020, months after Plaintiff's termination in August 2020. (*Id.* at ¶ 8, PageID.520.)

Plaintiff alleges in his Second Amended Complaint that one of the Check Airmen who conducted his remedial OE, Rob Numbers, made false statements on his evaluation form at the behest of Kalitta, who knowingly relied on the false information in assessing him as a failure in remedial training. (ECF No. 33, SAC, ¶¶ 29, 34, 40(e)) (ECF No. 43-3, Pl. Dep. at pp. 140-41, 143, PageID.462-63, 465.) Plaintiff admits however that he has no evidence Kalitta instructed Mr. Numbers to make inaccurate or false statements and no information to suggest that Mr. Numbers knew about Plaintiff's February 21, 2020, complaint regarding Mr. DeBourge. (ECF No. 43-3, Pl. Dep. at p. 143, PageID.465.) Rather, Plaintiff relies on his "feeling that they got Numbers on board." (*Id.* at pp. 145-46, PageID.467-68.)[2]

---

[2] Plaintiff also alleged in his complaint that Kalitta retaliated against him because it denied his unemployment benefits "due to Gross Misconduct," but that the State of Michigan Unemployment Office awarded [him] unemployment benefits due to lack of evidence after three months." (ECF No. 33, SAC, ¶¶ 35, 40(g).) Kalitta asserts in its Motion for Summary Judgment that Plaintiff has withdrawn this contention (ECF No. 43, Def. Mot., PageID.292), and Plaintiff does not contest this assertion in its Response brief. Accordingly, the Court considers that allegation abandoned.

Plaintiff filed a Charge of Discrimination with the Equal Employment Opportunity Commission (EEOC) on November 12, 2020, and he received a Notice of Right to Sue letter on April 29, 2021. (FAC, PageID.108.)

## B.   Procedural History

On June 16, 2021, Plaintiff, initially proceeding pro se, filed his original employment discrimination Complaint in this matter against Kalitta, asserting claims for sexual harassment and retaliation under Title VII. (ECF No. 1, Complaint.) Kalitta filed a motion to dismiss this Complaint on July 30, 2021. (ECF No. 14.)

On August 16, 2021, Plaintiff filed his First Amended Complaint (FAC) in lieu of a response to the motion to dismiss, again asserting claims against Kalitta for sexual harassment and retaliation under Title VII of the Civil Rights Act of 1964. (ECF No. 17, FAC.)

Kalitta filed a Motion to Dismiss the FAC Pursuant to Fed. R. Civ. P. 12(b)(6) on August 30, 2021. (ECF No. 19, Def. Mot.) After the motion was fully briefed, this Court entered an Opinion and Order granting the motion to dismiss. (ECF No. 23.)

Plaintiff appealed that decision to the Sixth Circuit Court of Appeals, and on August 2, 2022, that court entered a decision affirming in part, reversing in part, and

17

remanding for further proceedings. *Bar v. Kalitta Charters II, LLC*, No. 21-1739, 2022 WL 3042844 (6th Cir. Aug. 2, 2022). Specifically, the Sixth Circuit affirmed dismissal of Plaintiff's hostile work environment claim because Plaintiff "failed to allege sufficient facts establishing that Kalitta is liable as an employer for DeBourge's conduct." *Id.* at *4. The Sixth Circuit held, however, that Plaintiff alleged ''sufficient factual content' from which this court … could 'draw the reasonable inference' that Kalitta retaliated against Bar for complaining about DeBourge's conduct," and thus reversed dismissal of Plaintiff's retaliation claim and remanded to this Court for further proceedings. *Id*. at *5.

On remand, and now represented by counsel, Plaintiff filed a Second Amended Complaint (SAC) asserting a single Title VII retaliation claim against Kalitta. (ECF No. 33, SAC.) Kalitta filed an Answer on September 26, 2022. (ECF No. 36.)

On May 4, 2023, following the close of discovery, Kalitta filed the instant Motion for Summary Judgment seeking dismissal of Plaintiff's retaliation claim. (ECF No. 43.) Plaintiff filed a Response in opposition on May 23, 2023. (ECF No. 44.) Kalitta filed its Reply in support of its Motion for Summary Judgment on June 6, 2023. (ECF No. 46.)

## II.  LEGAL STANDARD

Summary judgment is appropriate where the moving party demonstrates that there is no genuine dispute as to any material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986); Fed. R. Civ. P. 56(a). "A fact is 'material' for purposes of a motion for summary judgment where proof of that fact 'would have [the] effect of establishing or refuting one of the essential elements of a cause of action or defense asserted by the parties.'" *Dekarske v. Fed. Exp. Corp.*, 294 F.R.D. 68, 77 (E.D. Mich. 2013) (quoting *Kendall v. Hoover Co.*, 751 F.2d 171, 174 (6th Cir. 1984)). A dispute is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986).

"In deciding a motion for summary judgment, the court must draw all reasonable inferences in favor of the nonmoving party." *Perry v. Jaguar of Troy*, 353 F.3d 510, 513 (6th Cir. 2003) (citing *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986)). At the same time, the non-movant must produce enough evidence to allow a reasonable jury to find in his or her favor by a preponderance of the evidence, *Anderson*, 477 U.S. at 252, and "[t]he 'mere possibility' of a factual dispute does not suffice to create a triable case." *Combs v. Int'l Ins. Co.*, 354 F.3d 568, 576 (6th Cir. 2004) (quoting *Gregg v. Allen-Bradley*

19

*Co.*, 801 F.2d 859, 863 (6th Cir. 1986)). Instead, "the non-moving party must be able to show sufficient probative evidence [that] would permit a finding in [his] favor on more than mere speculation, conjecture, or fantasy." *Arendale v. City of Memphis*, 519 F.3d 587, 601 (6th Cir. 2008) (quoting *Lewis v. Philip Morris Inc.*, 355 F.3d 515, 533 (6th Cir. 2004)). "The test is whether the party bearing the burden of proof has presented a jury question as to each element in the case. The plaintiff must present more than a mere scintilla of the evidence. To support his or her position, he or she must present evidence on which the trier of fact could find for the plaintiff." *Davis v. McCourt*, 226 F.3d 506, 511 (6th Cir. 2000) (internal quotation marks and citations omitted). "'The central issue is whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law.'" *Binay v. Bettendorf*, 601 F.3d 640, 646 (6th Cir. 2010) (quoting *In re Calumet Farm, Inc.*, 398 F.3d 555, 558 (6th Cir. 2005)). That evidence must be capable of presentation in a form that would be admissible at trial. *See Alexander v. CareSource*, 576 F.3d 551, 558–59 (6th Cir. 2009).

### III.  ANALYSIS

Plaintiff's sole remaining claim in this case is that Kalitta unlawfully retaliated against him for the complaint he made to Mr. Gaedtke about Mr. DeBourge showing him a pornographic video on February 21, 2020.

Title VII prohibits an employer from retaliating against an employee who has opposed an "unlawful employment practice." 42 U.S.C. § 2000e–3(a). "When an employee's supervisor retaliates against the employee, the employer is vicariously liable for the supervisor's unlawful actions." *Mys v. Mich. Dep't of State Police*, 886 F.3d 591, 600 (6th Cir. 2018) (quoting *Faragher v. City of Boca Raton*, 524 U.S. 775, 780 (1998)). A retaliation claim can be proved either by direct evidence of retaliation or by offering circumstantial evidence that permits an inference that an employer unlawfully retaliated illegally against an employee. *Laster v. City of Kalamazoo*, 746 F.3d 714, 730 (6th Cir. 2014) (quoting *Imwalle v. Reliance Med. Prods., Inc.*, 515 F.3d 531, 538 (6th Cir. 2008)). Plaintiff here does not present any direct evidence of retaliation, and thus must rely on "the burden-shifting framework" of *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973), and later clarified by *Texas Department of Community Affairs v. Burdine*, 450 U.S. 248 (1981), as discussed in *Hedrick v. W. Reserve Care Sys.*, 355 F.3d 444, 453 (6th Cir. 2004).

Under that framework, Plaintiff must first demonstrate a prima facie case of retaliation. *Laster*, 746 F.3d at 730. If he succeeds, the burden of production of evidence shifts to Kalitta, who must articulate a legitimate, non-retaliatory reason for its actions. *Id.* If Kalitta satisfies its burden of production, the burden shifts back to Plaintiff to demonstrate that Kalitta's proffered reason was not the true reason for

21

the employment decision, and that the real reason was unlawful retaliation. *Id.* (quoting *Dixon v. Gonzales*, 481 F.3d 324, 333 (6th Cir. 2007)). Although the burden of production shifts between the parties, the plaintiff always bears the burden of persuasion. *Id.*

### A.    Whether Plaintiff Can Establish a Prima Facie Case of Retaliation

The elements of a prima facie Title VII retaliation claim are that: (1) an employee engaged in activity protected by Title VII; (2) the decisionmaker had knowledge of the protected activity; (3) the employer took an adverse employment action against him; and (4) there is a causal link between the protected activity and the adverse employment action. *Laster*, 746 F.3d at 730 (quoting *Jones v. Johanns*, 264 F. App'x 463, 466 (6th Cir. 2007)). "The final element requires proof of so-called 'but for' causation, meaning that the plaintiff must furnish evidence that 'the unlawful retaliation would not have occurred in the absence of the alleged wrongful action or actions of the employer.'" *Mys*, 886 F.3d at 600 (quoting *Univ. of Tex. Sw. Med. Ctr. v. Nassar*, 570 U.S. 338, 360 (2013)).

### 1.  Protected activity

Plaintiff contends that he engaged in protected activity when he complained to Mr. Gaedtke about Mr. DeBourge showing him a pornographic video on his phone. "[C]omplaining about allegedly unlawful conduct to company management

is classic opposition activity." *Wasek v. Arrow Energy Servs., Inc.*, 682 F.3d 463, 469 (6th Cir. 2012). Kalitta does not dispute that this first element is satisfied, and the Court finds that Plaintiff has established that he engaged in protected activity for purposes of his Title VII retaliation claim.

### 2. The decisionmaker's knowledge of the protected activity

An employment decision cannot be considered retaliation for protected activity if the decisionmaker did not know about the alleged protected activity at the time of the adverse action. *Mulhall v. Ashcroft*, 287 F.3d 543, 552-53 (6th Cir. 2002) (stating that the decisionmaker's knowledge of the protected activity is an essential element of the prima facie case of unlawful retaliation). The plaintiff must show "that the relevant decision makers knew of any alleged protected activity when they took adverse action[.]" *E.E.O.C. v. New Breed Logistics*, 783 F.3d 1057, 1068-69 (6th Cir. 2015). However, direct evidence of knowledge by the decisionmaker is not required; "a plaintiff may survive summary judgment by producing circumstantial evidence to establish this element." *Mulhall*, 287 F.3d at 552. "[K]knowledge can be inferred from evidence of the prior interaction of individuals with such knowledge and those taking the adverse employment action." *Id.* at 553 (citing *Kralowec v. Prince George's Cnty., Maryland*, 503 F. Supp. 985, 1010 (D. Md. 1980), *aff'd*, 679 F.2d 883 (4th Cir.), *cert. denied*, 459 U.S. 872 (1982)) (holding that the knowledge

element was satisfied where plaintiff produced evidence that one county official knew of the plaintiff's complaint and that the "prior interaction" of that first official with the second official, who actually fired the plaintiff, made it "highly improbable ... that [the first official] would not have discussed plaintiff's complaint with [the second official] as soon as [the first official] obtained this information."); *see also Polk v. Yellow Freight Sys., Inc.*, 876 F.2d 527, 531 (6th Cir. 1989) (knowledge element satisfied where, after plaintiff visited the Michigan Department of Civil Rights, her supervisor told her, "I know where you've been").

First, as to the ultimate decision to terminate Plaintiff, Kalitta argues that Plaintiff cannot identify any person other than Mr. Gaedtke who knew of his complaint about Mr. DeBourge. (ECF No. 43-3, Pl. Dep. at p. 144, PageID.466 (Plaintiff agreeing that the only person aware of his complaint is Mr. Gaedtke).) Mr. Gaedtke testified that he did not tell anyone about Plaintiff's complaint about Mr. DeBourge, other than addressing the issue directly with Mr. DeBourge. (ECF No. 43-10, Gaedtke Decl. ¶¶ 8, 10, PageID.601.) The supervisor charged with making the final decision to terminate Plaintiff's employment, Mr. Coleman, testified that he did not have any knowledge of Plaintiff's complaint to Mr. Gaedtke at the time of Plaintiff's termination, and only found out about it for the first time months after Plaintiff's termination. (ECF No. 43-4, Coleman Decl. ¶ 8, PageID.520.)

24

Plaintiff first argues in his Response brief that there is a question of fact as to whether Mr. Coleman knew about Plaintiff's complaint about Mr. DeBourge because Plaintiff testified that he called Mr. Coleman immediately after the incident and left a message for Mr. Coleman to call him back. Plaintiff contends that it "strains credulity that [Mr. Coleman] would not have inquired of Gaedtke what transpired thereafter." (ECF No. 44, Pl. Resp., PageID.659.) The Court finds that this argument fails because Plaintiff testified that his voicemail to Mr. Coleman merely stated that he needed to talk to him and asked for Mr. Coleman to call him back. (ECF No. 43-3, Pl. Dep. at p. 53, PageID.375.) Plaintiff testified that he did not tell Mr. Coleman that Mr. DeBourge showed him a pornographic video in the simulator. (*Id.*) Mr. Coleman declared that he did not know of Plaintiff's complaint before he made the decision to terminate Plaintiff's employment (ECF No. 43-4, Coleman Decl. ¶ 8, PageID.520), and Mr. Gaedtke testified that he did not tell anyone about Plaintiff's complaint beyond addressing it directly with Mr. DeBourge. (ECF No. 43-10, Gaedtke Decl. ¶ 10, PageID.601.)[3]

---

[3] Plaintiff also asserts that shortly after the February 2020 incident with Mr. DeBourge, Kalitta's Human Resources department made everyone go through a sensitivity and sexual harassment training. (ECF No. 43-3, Pl. Dep. at p. 60, PageID.382.) However, Plaintiff has offered no evidence of this training, including when it took place, and he concedes that he has no evidence that this training was implemented because of his complaint. (*Id.*)

25

To survive a summary judgment motion, Plaintiff must put forward more than speculations or intuitions, and that is all Plaintiff has here with regard to his telephone call to Mr. Coleman. (See ECF No. 44, Pl. Resp., PageID.659 (speculating only that "[i]t strains credulity that [Mr. Coleman] would not have inquired of Gaedtke what transpired [after Plaintiff left his voicemail]").) Plaintiff has failed to produce any evidence to rebut Mr. Coleman's denial of knowledge beyond his speculation and conspiratorial theories. The Court finds that Plaintiff has failed to present sufficient evidence from which a reasonable jury could infer that Mr. Coleman knew about Plaintiff's prior complaint about Mr. DeBourge based on the voicemail Plaintiff left on Mr. Coleman's phone on February 21, 2020. *Mulhall*, 287 F.3d at 552 (holding that plaintiff failed to establish knowledge on the part of the decisionmaker where plaintiff did not produce any evidence, direct or circumstantial, to rebut evidence that the decisionmaker had no knowledge and plaintiff offered "only conspiratorial theories, not the specific facts required under the Federal Rule of Civil Procedure 56") (citing *Visser v. Packer Eng'g Assocs., Inc.,* 924 F.2d 655, 659 (7th Cir. 1991) (en banc) (holding that summary judgment was appropriate where the inferences plaintiff sought to draw from evidence were akin to "flights of fancy, speculations, hunches, intuitions, or rumors about matters remote from [personal] experience")); *see also Frazier v. USF Holland, Inc.*, 250 F. App'x 142,

26

148 (6th Cir. 2007) (holding that "Frazier has failed to produce any evidence, direct or circumstantial, to support his contention that Rose, indeed, had been informed of Frazier's 1997 activity" beyond his speculation or intuition).

Plaintiff, however, also argues that both Mr. Gaedtke and Mr. DeBourge influenced Mr. Coleman's termination decision by providing negative assessments of Plaintiff's performance during retraining, and that their alleged retaliatory animus may be imputed to Mr. Coleman. The Court finds, at this stage of the litigation, that there is a disputed question of fact as to whether Mr. Gaedtke's knowledge of Plaintiff's complaint to him may be imputed to Mr. Coleman in this case, based on Mr. Gaedtke's involvement in Plaintiff's termination. In Kalitta's discovery response to the Interrogatory asking Kalitta to "identify the individual or individual[s] who made, approved, ratified, or influenced the decision to terminate Plaintiff's employment," Defendant responded, in relevant part:

> "[T]he following individuals were collectively involved in the decision to terminate Plaintiff's employment with KALITTA:
>
> Doug Kalitta – President
>
> Mike Gaedtke – Chief Pilot
>
> Darrell Coleman – Director of Training
>
> Carl Barnes – Director of Operations

27

> Each of the foregoing individuals met and discussed the results of the Plaintiff's remedial training and determined that Plaintiff was not meeting KALITTA's standard of job performance despite extensive remedial training and that termination was appropriate.

(ECF No. 44-3, Defendant's Discovery Responses, PageID.683.) Further, Plaintiff testified that Mr. Gaedtke is the person who informed him that he was terminated. It is undisputed that Mr. Gaedtke had knowledge of Plaintiff's complaint about Mr. DeBourge prior to Plaintiff's termination, and despite Mr. Coleman's undisputed testimony that he was the sole decisionmaker and that he did not have knowledge of Plaintiff's protected activity when he made the decision to terminate Plaintiff's employment, the Court finds that Defendant's discovery response raises a genuine issue of material fact as to whether any persons "involved in" Plaintiff's termination, or who "made, approved, ratified, or influenced the decision to terminate Plaintiff's employment," which included Mr. Gaedtke, had knowledge of Plaintiff's protected activity at the time of Plaintiff's termination. *See Underwood v. Dynamic Sec., Inc.*, No. 18-00017, 2020 WL 5836550, at *7 (E.D. Tenn. Sept. 30, 2020) ("It is fair to conclude that Conroy's knowledge of Underwood's harassment complaints 'can be inferred from evidence of the prior interaction' between Conroy and Pauley, where Pauley was allegedly aware of the harassment complaints and attended the meeting in which Conroy terminated Underwood. That evidence is sufficient to establish at

the summary judgment stage of the case that Conroy knew about Underwood's complaints over Gibson's harassment of her."). Thus, the Court finds that, at this stage of the litigation, Plaintiff has satisfied this second element of his prima facie case with respect to the termination decision.[4]

---

[4] Because the Court finds a fact issue as to Mr. Coleman's knowledge of Plaintiff's protected activity at the time of termination, it need not also decide Plaintiff's alternate argument that Mr. DeBourge's knowledge also can be imputed to Mr. Coleman, relying on a "cat's paw" theory of liability. In any event, if it were to address this issue, the Court would find that Mr. DeBourge's alleged retaliatory animus could not be imputed to Mr. Coleman under the cat's paw theory of liability.

   "'A plaintiff alleging liability under the cat's paw theory seeks 'to hold [her] employer liable for the animus of a supervisor who was not charged with making the ultimate employment decision.'"" *Wyatt v. Nissan N. Am., Inc.*, 999 F.3d 400, 420-21 (6th Cir. 2021) (quoting *Marshall v. Rawlings Co.*, 854 F.3d 368, 377 (6th Cir. 2017) (quoting *Staub v. Proctor Hosp.*, 562 U.S. 411, 415 (2011)); *Mys*, 886 F.3d at 600; *Roberts v. Principi,* 283 F. App'x 325, 333 (6th Cir. 2008). Thus, "[w]hen a decisionmaker acts in accordance with a retaliator's bias without [him]self evaluating the employee's situation, the retaliator clearly causes the tangible employment action, regardless of which individual actually enforces the adverse transfer or termination." *Roberts,* 283 F. App'x at 333 (internal quotations and citation omitted). Applying liability in this circumstance accords with agency principles in that "the [retaliator] is the decisionmaker, and the titular decisionmaker is a mere conduit for the [retaliator's] discriminatory animus." *Id.* (internal quotations and citation omitted); *see also Madden v. Chattanooga City Wide Serv. Dep't,* 549 F.3d 666, 678 (6th Cir. 2008).

   However, when a decisionmaker makes a decision based on an independent investigation, any causal link between the subordinate's retaliatory animosity and the adverse action is severed. *Roberts*, 283 F. App'x at 333 (citing *Wilson v. Stroh Cos.,* 952 F.2d 942, 946 (6th Cir.1992); *EEOC v. BCI Coca–Cola Bottling Co.,* 450 F.3d 476, 485 (10th Cir. 2006) (explaining that "a plaintiff could not prevail because the decisionmaker had conducted an independent investigation of the facts, rather than relying entirely on the recommendation of the biased subordinate"); *Lacks v.*

However, as for Plaintiff experiencing other alleged retaliatory acts preceding

his termination, Kalitta asserts that there is no evidence that the decisionmakers, if

---

*Ferguson Reorganized Sch. Dist. R–2,* 147 F.3d 718, 725 (8th Cir.1998) (affirming summary judgment for employer school district because the board had engaged in an independent investigation rather than rely simply on the desires of school administrators)). "By making a decision based on an independent investigation, the decisionmaker confirms that he is acting as a true agent of the employer and not a mere conduit of the subordinate." *Id.* "The question becomes, then, whether the investigation … was an independent one or merely a façade." *Id.*

    The Court finds that the cat's paw theory of liability does not apply as to Mr. DeBourge in this case because he was not a supervisor of Plaintiff who had the ability to terminate him. *See Bar*, 2022 WL 3042844, at \*3-4 (dismissing Bar's hostile work environment claim because there is no indication that DeBourge had supervisory authority over Bar). *See also Shazor v. Professional Transit Mgmt., Ltd.*, 744 F.3d 948, 956 (6th Cir. 2014) (questioning whether employees constitute "supervisors" for the purpose of cat's paw liability). Plaintiff also ignores that just a month prior to his termination, Mr. DeBourge passed Plaintiff on his remedial simulator training (and thus displayed no retaliatory animus at that time). (ECF No. 43-5, PageID.534-35.) In addition, Kalitta has presented summary judgment evidence that Mr. Coleman did not blindly and solely rely on Mr. DeBourge's evaluation of Plaintiff's OE abilities as the basis for the termination decision, but instead conducted an independent investigation and considered Mr. DeBourge's evaluation in conjunction with the evaluations of the two other Check Airmen and Plaintiff's other retraining documents, and in consultation with Mr. Kalitta, Mr. Gaedtke, and Mr. Barnes. "[W]hen a decisionmaker makes a decision based on an independent investigation, any causal link between the subordinate's retaliatory animosity and the adverse action is severed." *Roberts*, 283 F. App'x at 333. Moreover, as discussed above, Mr. Coleman did not make the termination decision after receiving Mr. DeBourge's comments, but instead provided Plaintiff with an additional 14 hours of OE training with a different Check Airman and made the decision to terminate Plaintiff only after receiving that additional evaluation.

any, in those other alleged claims of retaliation were aware of Plaintiff's complaint about Mr. DeBourge. The Court agrees. Specifically:

• Defendant Kalitta has provided summary judgment evidence that Plaintiff's assignment to CVG rather than YIP after he began piloting 737 aircraft was not a decision made by any specific person. Rather, Kalitta did not have any scheduled 737 flights originating out of YIP, so assigning Plaintiff to YIP was not an option. (ECF No. 43-7, Handlon Decl., ¶¶ 9, 22, PageID.554-55, 558, citing ECF No. 43-9, 737 Flight Schedule, PageID.588-98.) Plaintiff fails to offer any summary judgment evidence to the contrary.

• Kalitta has provided summary judgment evidence that the failure to automatically provide Plaintiff a hotel room at CVG was not a decision made by any specific person. Instead, rooms were assigned in response to individual pilot accommodation requests because of the COVID-19 pandemic and it is undisputed that Plaintiff promptly received a hotel room when requested. (ECF No. 43-7, Handlon Decl., ¶¶ 11-12, PageID.555-56) (ECF No. 43-3, Pl. Dep. at pp. 80-83, PageID.402-05.) Plaintiff does not offer any summary judgment evidence to the contrary.

• Kalitta further provided summary judgment evidence that the occasional unavailability of a Captain or plane to Plaintiff at CVG and/or PHX

31

was not a decision made by any specific person. Rather, it resulted from Plaintiff's status as a spare pilot or due to routine schedule changes common to all pilots, not just Plaintiff. (ECF No. 43-7, Handlon Decl. ¶¶ 16-17, 23, PageID.557-59, citing ECF No. 43-9, 737 Flight Schedule, PageID.588-98.) Plaintiff does not offer any summary judgment evidence to the contrary.

•       Finally, as for Kalitta's reliance on Mr. Numbers' alleged false statements on his evaluation form, Plaintiff admits that he has no evidence Mr. Numbers was aware of his complaint about Mr. DeBourge. (ECF No. 43-3, Pl. Dep. at p. 143-45, PageID.466-68.)

Accordingly, the Court finds that a question of fact exists only as to whether a decisionmaker had knowledge of Plaintiff's protected activity with respect to the decision to terminate Plaintiff's employment, but not with respect to any of the remaining alleged retaliatory actions (even if they can be considered "materially adverse," and even if causation can be established, as discussed below). The Court thus finds that Kalitta is entitled to summary judgment as to those claimed pre-termination retaliatory actions based on Plaintiff's failure to meet this second element of his prima facie case.

32

### 3.  "Materially adverse" actions

In the Title VII retaliation context, for an action to be considered "materially adverse," a "plaintiff must show that a reasonable employee would have found the challenged action materially adverse, which in this context means it well might have dissuaded a reasonable worker from making or supporting a charge of discrimination." *Rogers v. Henry Ford Health Sys.*, 897 F.3d 763, 776 (6th Cir. 2018) (quoting *Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 64 (2006)). Such an action "'must be more disruptive than a mere inconvenience or an alteration of job responsibilities." *Michael v. Caterpillar Fin. Servs. Corp.*, 496 F.3d 584, 594 (6th Cir. 2007) (citation omitted). But Title VII does not protect against "all retaliation, only from retaliation that produces an injury or harm." *Taylor v. Geithner*, 703 F.3d 328, 336 (6th Cir. 2013) (quoting *Burlington*, 548 U.S. at 67). "'A materially adverse change might be indicated by a termination of employment, a demotion evidenced by a decrease in wage or salary, a less distinguished title, a material loss of benefits, significantly diminished material responsibilities, or other indices that might be unique to a particular situation.'" *Michael*, 496 F.3d 594. The United States Supreme Court has recognized that actions typically construed as nonmaterial could rise to the level of an adverse employment action when considered in context, such as a change in the work schedule of a young mother with children

in school. *Burlington*, 548 U.S. at 69 ("The real social impact of workplace behavior often depends on a constellation of surrounding circumstances, expectations, and relationships which are not fully captured by a simple recitation of the words used or the physical acts performed.").

The parties agree that Plaintiff's termination can be considered materially adverse.

But Kalitta argues that Plaintiff's remaining allegations of retaliation cannot be considered materially adverse actions because those actions constituted normal business operations and thus have not been shown to be "materially adverse" or retaliatory. Kalitta further states that Plaintiff was fully compensated for flights he did not actually conduct and for every day he did not fly, and thus cannot show he was injured or harmed.

Plaintiff argues in his Response brief only that the Sixth Circuit Court of Appeals has already ruled in this case that the other actions Plaintiff complains of may satisfy the materially adverse action requirement, and that this ruling constitutes the "law of the case," precluding Defendant's argument here to the contrary. (ECF No. 44, Pl. Resp., PageID.659-60, 662-64.)

However, the Sixth Circuit Court of Appeal's finding in this case that Plaintiff's allegations in his complaint regarding these alleged actions are sufficient

34

allegations of "materially adverse actions" to survive a motion to dismiss does not mean that, at the summary judgment stage, after discovery, there is *evidence* that these actions either deterred Plaintiff or would deter any reasonable person from engaging in protected activity. Under the law of the case doctrine, "when a court decides upon a rule of law, that decision should continue to govern the same issues in subsequent stages in the same case." *Scott v. Churchill*, 377 F.3d 565, 569-70 (6th Cir. 2004) (quoting *Arizona v. California*, 460 U.S. 605, 618 (1983)). However, it is hornbook law that the denial of a motion to dismiss has no bearing on whether the plaintiff can sufficiently support the allegations in the complaint with evidence to survive summary judgment. *See Miller v. Maddox*, 866 F.3d 386, 389-90 (6th Cir. 2017) ("[T]his court's prior holding on a motion to dismiss does not establish the law of the case for purposes of summary judgment, when the complaint has been supplemented by discovery."); *McKenzie v. BellSouth Telecomms. Inc.*, 219 F.3d 508, 513 (6th Cir. 2000) (same). The Rule 12(b)(6) standard differs greatly from the Rule 56 summary judgment standard. *See In re B & P Baird Holdings, Inc.*, 759 F. App'x 468, 478 (6th Cir. 2019) (while the court previously held that the "Trustee properly *alleged* a claim of conversion," "[t]he question of whether [the] trustee has proved that claim – or whether defendant has disproved it – is a separate one entirely[.]"). As the Sixth Circuit explained in a different case:

> [o]ur earlier ruling affirmed the denial of the defendant's motion to dismiss; we ruled that as a matter of law, the allegations of [plaintiff's] complaint stated a claim for First Amendment retaliation. In granting the defendant's motion for summary judgment; the matter before us here, the district court held that the evidence introduced by [plaintiff] for purposes of summary judgment failed to raise a material issue of fact as to his retaliation claim and that the evidence did not support [the plaintiff's] claim that his speech concerned matters of public interest. These are two separate issues.

*Wilkins v. Jakeway*, 44 F. App'x 724, 727-28 (6th Cir. 2002) (citations omitted).

Plaintiff here offers no summary judgment evidence regarding this element in his Response brief.

It is well settled that a materially adverse action does not include trivial harms, such as "petty slights or minor annoyances that often take place at work and that all employees experience." *Burlington*, 548 U.S. at 68. Plaintiff has failed to put forth any summary judgment evidence to dispute Kalitta's evidence that Plaintiff's alleged "adverse actions" preceding his termination are generally Plaintiff's disputes with Kalitta's normal business operations that all employees experienced, not just Plaintiff. Although differential enforcement of rules and disproportionate discipline can constitute materially adverse actions, *see Laster*, 746 F.3d at 732, Plaintiff fails to present any evidence that such actions were actually taken against him.

In any event, the Court need not determine whether there is sufficient evidence of materially adverse actions because, as discussed above, there is no evidence that

36

any "decisionmaker" with respect to those pre-termination alleged materially adverse actions had knowledge of Plaintiff's protected activity. Moreover, as discussed next, even assuming *arguendo* that those pre-termination actions qualify as materially adverse actions, the Court finds that no reasonable factfinder could find on this record that Plaintiff's complaint about Mr. DeBourge was the "but for" cause of any of those actions.

### 4. Causation

To prove the causation element of his prima facie case, Plaintiff must demonstrate "that the 'unlawful retaliation would not have occurred in the absence of the alleged wrongful action or actions of the employer.'" *Mys*, 886 F.3d at 600 (quoting *Nassar*, 570 U.S. at 360); *see also Dixon*, 481 F.3d at 333. The plaintiff "must establish that his or her protected activity was a but-for cause of the alleged adverse action." *Nassar*, 570 U.S. at 362. Temporal proximity between the protected conduct and the adverse action generally is not enough alone, although it is "highly probative evidence of a causal connection." *Arendale v. City of Memphis*, 519 F.3d 587, 606 (6th Cir. 2008). But "a temporal connection coupled with other indicia of retaliatory conduct may be sufficient to support a finding of a causal connection." *Randolph v. Ohio Dep't of Youth Servs.*, 453 F.3d 724, 737 (6th Cir. 2006). Courts have "always looked at the totality of the circumstances to determine whether an

37

inference of retaliatory motive could be drawn." *Vereecke v. Huron Valley Sch. Dist.*, 609 F.3d 392, 400-01 (6th Cir. 2010). The burden of proof at the prima facie stage is minimal; all the plaintiff must do is put forth some credible evidence that enables the court to deduce that there is a causal connection between the retaliatory action and the protected activity. *Dixon*, 481 F.3d at 333.

Kalitta argues that there is no evidence that any of the alleged retaliatory actions resulted from his protected activity. First, Kalitta provided summary judgment evidence that Plaintiff was reassigned to CVG from YIP when Kalitta transitioned from the DC-9 aircraft to the 737 aircraft, after which time none of Kalitta's scheduled 737 flights originated from YIP, and there was no longer a scheduled route for Plaintiff *or any other former DC-9 pilot* originating in YIP. (ECF No. 43-7, Handlon Decl. ¶¶ 9, 22, PageID.554, 558, citing ECF No. 43-9, 737 Flight Schedule, PageID.588-98.)[5] Therefore, Kalitta presented summary judgment

---

[5] Plaintiff contends that he knows of one instance when a Captain, Glen Ingle (nicknamed "Gunner"), flew a 737 aircraft ad hoc out of YIP. Plaintiff argues that he should have been assigned as Ingle's co-pilot on that flight, and that Kalitta's failure to do so constitutes retaliation. (ECF No. 44, Pl. Resp., PageID.648.) However, that one pilot, a Captain and not a First Officer like Plaintiff, flew an unscheduled, ad hoc flight out of YIP on one occasion when he was scheduled to fly as a "spare" pilot, fails to establish retaliatory conduct. Kalitta presented unrebutted summary judgment evidence of the schedules of all of its 737 pilots, which shows that *no* 737 pilots were scheduled to fly out of YIP.

evidence that this reassignment was because of normal business operations and not causally related to Plaintiff's protected activity. Plaintiff offers no evidence to the contrary.

Second, Kalitta provides summary judgment evidence that Plaintiff's protected activity was not causally related to his complaint that Kalitta required him to sleep in a busy crew quarter instead of providing him with a hotel room when he was assigned to CVG. Plaintiff acknowledges that when he started flying out of CVG, he and other Kalitta pilots would wait in the crew room during the sort. (ECF No. 43-3, Pl. Dep. at pp. 80-82, PageID.402-04.) In August 2020, Plaintiff saw two Kalitta Captains going to a hotel while he was headed to the crew lounge. Plaintiff called the Kalitta dispatcher, requested a hotel room, and immediately received one. (*Id.* at pp. 80-83, PageID.402-05.) Plaintiff admits that he does not know whether hotel rooms were assigned or requested by the Captains previously, or whether any First Officers (like Plaintiff) were given a hotel room. (*Id.* at pp. 83-84, PageID.405-06.) However, Kalitta provided evidence that typically all Kalitta pilots were required to wait in the crew lounge during the sort, but that during the COVID-19 pandemic some pilots started requesting hotel rooms during the sort as an accommodation to limit their exposure and they were given a room upon request. (ECF No. 43-7, Handlon Decl. ¶ 12, PageID.555-56.) Plaintiff was similarly given

39

a hotel room upon request. At no point were some pilots automatically assigned to hotel rooms while others were not, and rooms instead were assigned by request, before ultimately being assigned to all pilots. (*Id.*) Therefore the hotel assignment was a part of Kalitta's normal business operations at the time and was not causally related to Plaintiff's protected activity. Plaintiff offers no evidence to the contrary.

Third, Kalitta provides summary judgment evidence that Plaintiff's complaint that occasionally no Captain or no plane was available to him when he arrived at CVG is not causally connected to Plaintiff's protected activity. Kalitta demonstrated that Plaintiff and other pilots were routinely scheduled as "reserves" or "spares" who are not intended to fly unless needed, and also that flight schedules change for a host of other, non-retaliatory reasons, such as aircraft maintenance issues and weather. (ECF No. 43-7, Handlon Decl. ¶ 23, PageID.558-59, citing ECF No. 43-9, 737 Flight Schedule, PageID.588-98.) In addition, Plaintiff, like other spare pilots, was provided a hotel room and was fully compensated for the flights he did not actually conduct. (*Id.*) Therefore, Kalitta has provided the Court with summary judgment evidence that Plaintiff's status as a spare pilot was part of Kalitta's customary business operations and was not causally related to Plaintiff's protected activity. Plaintiff offers no evidence to the contrary.

Fourth, there is no evidence that Plaintiff's complaint that he only flew out of PHX two times when he was scheduled to fly for the entire week in early May 2020 was causally related to his February 21, 2020, protected activity. Kalitta has provided evidence that Plaintiff did not fly all his scheduled flights because another Kalitta pilot needed to log flight time. (ECF No. 43-7, Handlon Decl. ¶ 16, PageID.556-57, citing ECF No. 43-8, Scheduling Emails, PageID.562-86.) Plaintiff was informed of the reason for the scheduling change at the time, and he was paid his full pay on those days he was not required to fly. Plaintiff in fact conceded at his deposition that he no longer believes that this is a retaliatory event. (ECF No. 43-3, Pl. Dep. at pp. 94-95, 114-15, PageID.416-17, 436-37.)

Fifth, Plaintiff claims he was treated disparately after the June 2020 veer off event because of his complaint about Mr. DeBourge. However, after the event, both Plaintiff and Captain Buchanan were determined to be at fault, and both pilots were assigned to remedial training. Kalitta provided summary judgment evidence that Captain Buchanan and Plaintiff had the same training and results until after they passed their second proficiency checks on July 1 and 14, 2020, respectively. (ECF No. 43-4, Coleman Decl. ¶ 20, citing ECF Nos. 43-5 (Plaintiff's Training Records) and 43-6 (Captain Buchanan's Training Records).) At that point, Captain Buchanan was demoted to First Officer and underwent 25 hours of remedial OE, which he

41

passed, to regain his Captain's seat. (*Id.* ¶ 30, PageID.526.) Plaintiff was not demoted and went directly to remedial OE as a First Officer to be evaluated to return to flying unsupervised as a First Officer. (*Id.* ¶¶ 20, 23-26, PageID.523-25.) Plaintiff ultimately was given over 37 hours of flight time to be evaluated independently by three different Check Airmen, but he did not pass OE. (*Id.*) Plaintiff has failed to provide summary judgment evidence that he was treated disparately following the veer-off incident because of his engagement in protected activity.

Finally, Plaintiff claims that he was terminated due to false information from Check Airman Rob Numbers. However, Plaintiff admits that he has no evidence that Kalitta instructed Mr. Numbers to make inaccurate or false statements, and importantly no evidence that Mr. Numbers knew about Plaintiff's complaint about Mr. DeBourge. (ECF No. 43-4, Pl. Dep. at p. 143, PageID.465 (admitting that he instead relies on his "feeling that they got Numbers on board").) Plaintiff's mere disagreement with Mr. Numbers' assessments, or with the assessments of the other Check Airmen who evaluated him, is insufficient to establish the causation element of his prima facie case.[6]

---

[6] Plaintiff attaches unauthenticated, obscure, and confusing documents and purported "public records" in support of his assertion that Mr. Numbers' evaluation report contained errors. (ECF No. 44, Pl. Resp., PageID.654, citing Exs. J, K, L, N.) Plaintiff contends that one statement in Mr. Numbers' assessment can be disproven

The Court finds that Plaintiff has failed to present any summary judgment evidence that his prior complaint about Mr. DeBourge was the "but for" cause of any of the alleged retaliatory acts by Kalitta, including his termination six months after his complaint to Mr. Gaedtke, and that he therefore cannot establish his prima facie case of retaliation. *See Thornton v. Fed. Express Corp.*, 530 F.3d 451, 455 (6th Cir. 2008) (explaining that the mere fact that an employer took an adverse action against an employee after he engaged in protected activity is insufficient to justify an inference that there was a causal connection between the two events); *Vereecke*,

---

by a screenshot of a database called "Flightaware." (ECF No. 44, Pl. Resp., PageID.654.) According to Plaintiff, Flightaware "logs information on commercial flights and makes it available to the public," including "tracking information for a plane's flight path," and Plaintiff interprets the Flightaware printout at Ex. J to show that Plaintiff did not overshoot the runway on one occasion. (*Id.* (also relying on Plaintiff's created exhibit titled "Hypothetical Flightaware Data (showing what a runway overshoot would look like if it occurred").) Plaintiff also takes issue with Mr. Numbers' reference to "KEDZE" in his evaluation, contending that "[t]here is no 'Kedze.'" (*Id.*) Plaintiff did not depose Mr. Numbers regarding his assessment and failed to provide any sworn affidavit or declaration or expert testimony to explain or interpret the internet printouts he attaches as Exhibits J, K, and N. The Court doubts whether Plaintiff would be able to rely on these documents at trial over hearsay and/or authenticity objections. *See* Fed. R. Civ. P. 56(c)(2) ("A party may object that the material cited to support or dispute a fact cannot be presented in a form that *would be* admissible in evidence.") (emphasis added). In any event, even considering Plaintiff's argument, as explained herein, Plaintiff has failed to provide any summary judgment evidence that Mr. Numbers had knowledge of Plaintiff's protected activity, and thus cannot provide evidence that his protected activity was the "but for" cause of Mr. Numbers' negative assessment, even if that assessment could be shown to be in part inaccurate.

43

609 F.3d at 401 (temporal proximity of eight months "and the presence of an obviously nonretaliatory basis for the defendants' decision amount to insufficient evidence to permit an inference of a retaliatory motive.").

### B.   Whether Kalitta Has Articulated a Legitimate, Non-retaliatory Reason to Terminate Plaintiff

If a plaintiff establishes a prima facie case of retaliation, the burden of production of evidence shifts to the employer to "articulate some legitimate, nondiscriminatory reason" for its actions. *Morris v. Oldham Cnty. Fiscal Court*, 201 F.3d 784, 792 (6th Cir. 2000). Even if the Court here was to find that Plaintiff established a prima facie case of retaliation (which it does not), Kalitta has stated a legitimate, non-retaliatory reason for Plaintiff's termination – that based on nearly 40 hours of remedial evaluation by multiple FAA-certified evaluators, following Plaintiff's June 2020 veer-off incident, Kalitta did not believe Plaintiff could adequately pilot the 737. (ECF No. 43-4, Coleman Decl. ¶ 29, PageID.525-26.)

Kalitta therefore has met its burden to articulate a legitimate, non-retaliatory reason for its employment decision, which undermines Plaintiff's circumstantial case, unless Plaintiff establishes that Kalitta's stated reason is a pretext for retaliation. *Laster*, 746 F.3d at 730.

44

### C.     Whether Plaintiff Has Demonstrated Pretext

If the employer satisfies its burden to articulate a legitimate, non-retaliatory reason for the alleged adverse actions, the burden of production then shifts back to the plaintiff to show that the employer's proffered reason was mere pretext for intentional retaliation. *Wyatt*, 999 F.3d at 421. "To demonstrate pretext, a plaintiff must show *both* that the employer's proffered reason was not the real reason for its action, *and* that the employer's real reason was unlawful." *E.E.O.C. v. Ford Motor Co.*, 782 F.3d 753, 767 (6th Cir. 2015) (citations omitted) ("To avoid summary judgment, the, the EEOC must present evidence from which a reasonable jury could find that poor performance was not the real reason Ford terminated Harris, and that unlawful retaliation in fact was."). To establish pretext, Plaintiff here must show that Kalitta's legitimate nondiscriminatory reason (1) had no basis in fact; (2) did not actually motivate the adverse action; or (3) was insufficient to warrant Plaintiff's termination. *Wyatt*, 999 F.3d at 421. Although a plaintiff cannot rest solely on temporal proximity to establish pretext, "suspicious timing is a strong indicator of pretext when accompanied by some other, independent evidence." *Id.* at 421-22.

Plaintiff first argues that Kalitta's decision to put Plaintiff into remedial training after the veer-off incident was based on demonstrable pretext because Plaintiff asserts that the plane went off the runway because of an equipment failure,

45

and not due to any error on Plaintiff's part. (ECF No. 44, Pl.'s Resp., PageID.660-61.) Plaintiff asserts that he told Kalitta that the accident was not his fault. However, Plaintiff fails to provide any evidence supporting this self-serving version of these events. Plaintiff suggests that Kalitta's failure to review the "black boxes" from the aircraft "is telling," but Plaintiff ignores the maintenance records produced in discovery, which show that after the accident, Kalitta requested a check on the autothrottle system and engines and found no defects. (ECF No. 46-3, Coleman Supp. Decl. ¶¶ 7-13, PageID.758-59, citing ECF No. 46-4, Maintenance Records, PageID.761-71.) The Court finds that the undisputed fact of the veer-off incident when Plaintiff was piloting the plane, coupled with Kalitta's unrebutted post-accident investigation, provided the factual bases for its decision to send both pilots to remedial training. *See Ford Motor Co.*, 782 F.3d at 768 (explaining that courts considering pretext examine "'the facts as they appear to the person making the decision to terminate [the employee],' not … 'the employee's subjective [beliefs].'").

Plaintiff next argues that the negative statements by the Check Airmen regarding Plaintiff during the remedial training were pretextual. (ECF No. 44, Pl. Resp., PageID.661.) Plaintiff contends that Mr. Numbers' comments contained factual inaccuracies, and Plaintiff relies on the prior August 5, 2020 email from Mr.

46

Numbers to Mr. Coleman that stated that Plaintiff's "PF [pilot flying] skills (3 legs) were up to standards" and that with respect to mistakes by Plaintiff, that "he was retrained to standards" when Mr. Numbers flew with Plaintiff on July 24-25, 2020. (*Id.* citing ECF No. 44-2, Emails, PageID.671-72.) The summary judgment evidence shows that Mr. Numbers did not know of Plaintiff's complaint about Mr. DeBourge and Plaintiff's mere disagreement with Mr. Numbers' comments does not render Kalitta's reliance on Mr. Numbers' evaluation, in conjunction with the evaluation of two other Check Airmen, Ingle and DeBourge, pretextual. *See Ford Motor Co.*, 782 F.3d at 768 (finding that plaintiff's "'subjective skepticism regarding the truth of'" the defendant's proffered reason for termination "does not alone 'raise a triable issue as to pretext.'").

Significantly, Plaintiff ignores that the two Check Airmen he interprets as making some "positive comments" in their emails nevertheless did not approve him to return to unsupervised flight by signing off on Plaintiff's OE as satisfactory. Plaintiff has failed to provide summary judgment evidence that Mr. Coleman was not entitled to rely on all these evaluations in making the decision to terminate Plaintiff's employment. *See Ford Motor Co.*, 782 F.3d at 767 (stating that plaintiff must present evidence from which a reasonable jury could find that poor

47

performance was not the real reason defendant terminated him, *and* that unlawful retaliation was).

Further, Plaintiff ignores that Mr. Coleman solicited input from the three Check Airmen on August 5, 2020, and received their responses by the next day. (ECF No. 44-2, Emails, PageID.671-73.) Those Check Airmen had not signed off on Plaintiff's proficiency to fly at that date. Mr. Coleman did not terminate Plaintiff at that time, but instead provided Plaintiff an additional 14 hours of evaluation with Check Airman Numbers. (ECF No. 43-4, Coleman Decl. ¶¶ 27-29, PageID.521.) Mr. Coleman then made the decision to terminate Plaintiff only after he continued to fail to show sufficient progress. Engaging in a protected activity does not "shield against legitimate employer actions" because "by engaging in a protected activity an employee does not acquire immunity from the same risks that confront virtually every employee ever day in every workplace." *See Blackie v. State of Maine*, 75 F.3d 716, 723-24 (1st Cir. 2010). Thus, the summary judgment evidence shows that Plaintiff was terminated based on his unsatisfactory piloting ability after causing an accident, and not as part of a conspiracy to retaliate against him for reporting that another employee showed him a pornographic video six months earlier. Plaintiff has not come forward with sufficient evidence that this reason has no basis in fact, was not the real reason, or was insufficient to explain his termination.

It is not this Court's role to "sit as a 'super-personnel department,' second-guessing management decisions." *Hardesty v. Kroger Co.*, 758 F. App'x 490, 496 (6th Cir. 2019) (quoting *Krenik v. Cnty. of Le Sueur*, 47 F.3d 953, 960 (8th Cir. 1995)); *see also Lee v. City of Columbus, Ohio*, 636 F.3d 245, 258 (6th Cir. 2011) ("It is not within the province of the courts to ... 'act as super personnel departments to second guess an employer's facially legitimate business decisions.'") (citation omitted); *Correll v. CSX Transp., Inc.*, 378 F. App'x 496, 505 (6th Cir. 2010) ("Thus, [Plaintiff] asks us to second guess [Defendant's] employment decision, not because she offers admissible evidence that indicates [Defendant's] gender bias, but because she feels that she was treated unfairly. 'Time and again we have emphasized that [o]ur role is to prevent unlawful hiring practices, not to act as a super personnel department that second guesses employers' business judgments.'") (citation omitted). "When an employer reasonably and honestly relies on particularized facts in making an employment decision, it is entitled to summary judgment on pretext even if its conclusion is later shown to be mistaken, foolish, trivial, or baseless." *Chen v. Dow Chem. Co.,* 580 F.3d 394, 401 (6th Cir. 2009). "An employer's pre-termination investigation need not be perfect in order to pass muster under the rule." *Loyd v. Saint Joseph Mercy Oakland*, 766 F.3d 580, 591 (6th Cir. 2014) (citing *Seeger v. Cincinnati Bell Tel. Co.*, 681 F.3d 274, 285 (6th Cir. 2012)). "The key

49

inquiry is instead 'whether the employer made a reasonably informed and considered decision before taking an adverse employment action.'" *Id.* (quoting *Seeger*, 681 F.3d at 285). "And to rebut an employer's invocation of the rule, the plaintiff must offer some evidence of 'an error on the part of the employer that is too obvious to be unintentional.'" *Id.* (quoting *Seeger*, 681 F.3d at 286).

Upon consideration of the arguments and evidence, the Court finds that there are no genuine issues of material fact surrounding Plaintiff's termination that a jury could find supports Title VII retaliation. The Court therefore grants Defendant Kalitta summary judgment and dismisses Plaintiff's complaint with prejudice.

## IV.  CONCLUSION

For the reasons set forth above, the Court **GRANTS** Defendant's Motion for Summary Judgment and **DISMISSES** Plaintiff's Title VII retaliation claim **WITH PREJUDICE**.

This is a final order that closes the case.

IT IS SO ORDERED.

s/Paul D. Borman
Paul D. Borman
United States District Judge

Dated: October 24, 2023